### In re George I. BENNY, and Alexandra Benny, Debtors.

### No. C–84–120 Misc. RHS.

United States District Court,
N.D. California.

Nov. 29, 1984.

---

John T. Hansen, Lewis C. Maldonado, San Francisco, Cal., for Alexandra Benny, debtor.

Vernon D. Stokes, Stokes & Welsh, San Francisco, Cal., for Trustees.

Steven R. Ross, Gen. Counsel To Clerk of U.S. House of Representatives, Washington, D.C., for Intervenors House Speaker and Bipartisan Leadership Group.

Michael Davidson, U.S. Senate Legal Counsel, Washington, D.C., for Senate Intervenor-Applicant.

Lawrence J. Kaiser, Kronish, Lieb, Shainswit, Weiner & Hellman, New York, New York City, Jeffrey L. Schaffer, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., for Intervenor-Applicants Bankruptcy-Judges.

Sandra Willis, Ass't. U.S. Atty., Department of Justice, San Francisco, Cal., for Intervenor-U.S.A.

William Kelly, Miller, Starr & Regalia, San Francisco, Cal., for Unsecured Creditors' Committee.

Edward A. Weiner, Pillsbury, Madison & Sutro, San Francisco, Cal., for Chicago Title Insurance Co.

## MEMORANDUM DECISION

SCHNACKE, District Judge.

### I.

This bankruptcy case was commenced by the filing of a joint involuntary bankruptcy petition on May 19, 1982, against George I. Benny and Alexandra Benny, husband and wife. Thereafter, over their opposition, the Bankruptcy Court entered an order for relief. On July 23, 1984, Bankruptcy Judge Lloyd King held a hearing on Debtors' motions to dismiss the bankruptcy case and for a rehearing of the order. During that hearing, Debtor Alexandra Benny challenged Judge King's authority, ostensibly vested in him pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act"), to exercise jurisdiction over any bankruptcy matters. All motions were taken under submission. Debtor Alexandra Benny, thereafter, filed for partial withdrawal of the reference of this case and, on July 27, 1984, this Court granted said motion.

On November 2, 1984, this Court held a hearing on Debtor Alexandra Benny's motions to: (a) declare unconstitutional the 1984 Act, §§ 106 and 121, thereof; and (b) rescind the July 20, 1984 Order of the United States District Court for the Northern District of California, referring all bankruptcy proceedings to bankruptcy judges appointed pursuant to § 121 of the 1984 Act. The United States filed intervention papers and papers in support of Benny's motion.

The bankruptcy trustee opposed the Benny motion. The following parties moved this Court to intervene and submitted their respective papers in opposition to Benny's motion: (a) the United States Senate; (b) the Speaker and Bipartisan Leadership Group of the House of Representatives; (c) Bankruptcy Judges Lundin, McFeeley, Norton, Paine, Robinson and Votolato; and (d) the Unsecured Creditor's Committee.

With the exception of the Bankruptcy Judges, this Court permitted all applicant/intervenors to intervene. The Bankruptcy Judges' opposing papers were

deemed to be those of *amici curiae* and counsel was permitted to appear as such.

■ Initially, the Trustee argues that the Debtors do not have standing to challenge the constitutionality of the 1984 Act. No persuasive reason for this view is advanced. It seems self-evident that one, involuntarily brought before a tribunal, has the right to challenge the authority of that tribunal to act.

The constitutionality of the 1984 Act [P.L. 98–353, 98 Stat. 383], is challenged by the Debtors, whose sole ally is the Department of Justice of the United States (which purports to be appearing on behalf of the United States). They will both be included, hereinafter, in the term "Opponents".

Constitutionality is supported by the Trustee, the Official Unsecured Creditors Committee, the United States Senate, the Speaker and Bipartisan Leadership Group of the House of Representatives, and, as *amici curiae*, certain sitting Bankruptcy Judges. They will be termed "Proponents".

The basic simple question here, of course, is whether Judge King has any authority to act in this case; but the underlying question is whether *any* bankruptcy judge, now sitting, has authority to do so.

Opponents say "No", and base their view on three propositions: first, that the term of all bankruptcy judges expired on June 27, 1984; second, that their successors can be appointed only in consonance with the Appointments Clause of Article II of the United States Constitution; and, third, that any attempt by Congress to rectify the situation constitutes retroactive legislation which, they contend, is constitutionally forbidden.

We find no support for any of the three propositions.

## II.

We must begin our analysis by a review of where the bankruptcy laws were, what happened to them along the way, and where, in our view, they are now.

Pursuant to Section 34(a) of the old Bankruptcy Act, [11 U.S.C. § 62(a) (repealed)], Congress vested the power to appoint bankruptcy judges (then called "referees") in the district courts and fixed their terms of office at six years plus a "holdover" period—until a successor was appointed. Bankruptcy Judge Lloyd King was originally appointed to office by the district court in accordance with this statute on December 1, 1975. He has remained in office continuously since that date.

In 1978, after years of review and consideration, Congress enacted a comprehensive revision of the substantive law of bankruptcy and the structure of the bankruptcy court. The 1978 Act replaced the referee system with a bankruptcy court of substantially expanded jurisdiction. After a transition period, bankruptcy judges were to be appointed to 14-year terms by the nomination of the President and the advice and consent of the Senate, subject to removal from office by the Judicial Council of the Circuit for incompetence, misconduct, neglect of duty or physical or mental disability [28 U.S.C. §§ 151(a), 152, 153(a), 153(b), 1471(b) (1978) (repealed)].

The bankruptcy court structure enacted in 1978 did not take full effect immediately. The 1978 Act established a four-and-one-half year transition period during which the existing courts of bankruptcy were continued. Bankruptcy judges were granted expanded jurisdiction and authority and, of special relevance here, the terms of office of bankruptcy judges were extended to March 31, 1984 or "when their successors took office." [P.L. No. 95–598, §§ 401–411, 92 Stat. 2682–88].

On June 28, 1982, the Supreme Court upset the comprehensive revisions in the 1978 Act, declaring unconstitutional the broad grant of jurisdiction under 28 U.S.C. § 1471 of Article III authority to non-Article III judges [*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)]. The Supreme Court applied its holding prospectively and twice stayed its judgment to reduce disruption to the system while expecting Congressional enact-

ment of remedial legislation [*Id* at 88, 102 S.Ct. at 2880; *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 459 U.S. 813, 103 S.Ct. 200, 74 L.Ed.2d 160 (1982)].

When the second stay expired on December 24, 1982, the Judicial Conference of the United States recommended, and district courts promulgated, temporary emergency rules, authorizing continued reference of bankruptcy proceedings to the bankruptcy judges.[1]

As the bankruptcy system continued under the patch-work repair of the local emergency rules, Congress continued to consider the appropriate legislative restructuring of the bankruptcy courts system. There was initial disagreement on the status of bankruptcy judges and their correlative authority to act.[2]

Resolution of these differences was complicated by differences over proposed changes in the substantive law governing consumer bankruptcy and rejection of labor contracts.[3]

Shortly before the scheduled termination of the transition period under the 1978 Act, the House agreed with the Senate's position making bankruptcy judges adjuncts of the district courts and adopted provisions on consumer bankruptcy close to the position the Senate had already adopted [*Compare* H.R. 5174, 98th Cong., 2nd Sess. *with* S. 1013, 98th Cong., 2nd Sess. *See* 130 Cong.Rec.H. 1854 (daily ed. March 21, 1984)]. The House bill sought to eliminate chaos and disruption of the bankruptcy system by extending the terms of incumbent judges for eight years from the date of either their last appointment by the district court, or their continuation in office by the

circuit court as authorized by the 1978 Act [H.R. 5174 at H. 1844–45, § 106(a) of reprinted text of bill)]. Thereafter, new appointments of bankruptcy judges to new 14-year terms would be vested in the courts of appeals [*See id.* at H. 1843 (§ 104(a))]. However, despite basic agreement on the composition of the courts and on consumer bankruptcy issues, Congress had not by that time reached agreement on the issue of rejection of collective bargaining agreements.

Unable to resolve fully their differences by March 31, 1984, Congress enacted an interim measure amending the 1978 Act to extend the transition period to April 30, 1984 [P.L. No. 98–249, 98 Stat. 116 (March 31, 1984)].

On April 30, 1984, when Congress had still not reached agreement on the substantive policy issues primarily with respect to labor contracts, Congress enacted another extension of the transition period to May 25, 1984 [P.L. No. 98–271, 98 Stat. 163 (April 30, 1984)].

The transition period was extended two more times before enactment of the 1984 Act. As the Senate began floor action on H. 5174 in May, treatment of collective bargaining agreements remained the primary issue of controversy. With respect to the composition of the bankruptcy court, the Senate offered an amendment to the House bill, including a provision to shorten the transition provisions by authorizing the courts of appeals to make new appointments immediately but permitting the incumbent bankruptcy judges to serve until the earlier of appointment of their successors or October 1, 1985 [*See* 130 Cong.Rec. S. 6085, S. 6110 (daily ed. May 21, 1984) (§ 106)]. However, differences on treat-

---

1. The emergency rules, which generally became effective on or immediately after December 24, 1982, essentially revived the jurisdiction, the authority to determine, and standard of appellate review which were in existence prior to the 1978 Act. General Order No. 24, issued on December 27, 1982, became operative in this district.

2. The House Judiciary Committee reported H.R. 3, 98th Congress, early in 1983 providing for an Article III bankruptcy court [*See* H.R.Rep. No. 9, Pt. 1, 98th Cong., 1st Sess. (1983)]. A little

later, the Senate Judiciary Committee reported a bill establishing non-Article III bankruptcy judgeships to assist the district courts which would retain bankruptcy authority [S. 1013, 98th Cong; *See* S.Rep. No. 55, 98th Cong., 1st Sess. (1983)].

3. In February, 1984, the Supreme Court held that collective bargaining agreements could be rejected by debtors [*N.L.R.B. v. Bildisco and Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)].

ment of labor contracts persisted, and a third extension—to June 20, 1984—was passed [P.L. No. 98–299, 98 Stat. 214 (May 25, 1984)].

In a final attempt to resolve the differences in the treatment of labor contracts, the Senate proposed to settle the matter in conference between the Houses, [130 Cong. Rec. S. 7617, S. 7625 (daily ed. June 19, 1984)], and a fourth extension—to June 27, 1984—was enacted on June 20 as an extra element of protection should the conferees not complete action immediately [P.L. No. 98–325, 98 Stat. 268 (June 20, 1984)].

Although Congress anticipated completing action on the legislation by the expiration of the last extension, to June 27, 1984, [see Cong.Rec. at H. 6088 (daily ed. June 20, 1984),], the Conferees did not resolve their differences until June 28, 1984, and the Conference Report was not agreed to by both Houses until June 29, 1984. It was not signed into law until July 10, 1984.

The Bankruptcy Amendments and Federal Judgeship Act of 1984, [P.L. No. 98–353, 98 Stat. 333 (July 10, 1984) ("the 1984 Act")] as finally enacted represented a compromise of the issue involving continuation in office of the bankruptcy judges from the House version, providing for a phase-in of new bankruptcy judge appointments over a period of up to eight years, and the Senate version which had proposed a continuation in office of a little more than one year. Thus, as enacted, Section 106(a) of the 1984 Act provides for a phase-in period of between approximately two and four years: "[T]he term of office of a bankruptcy judge who is serving on the date of enactment of this Act is extended to and

expires four years after the date such bankruptcy judge was last appointed to such office or on October 1, 1986, whichever is later" [P.L. No. 98–353, § 106(a), 98 Stat. 333].[4]

### III.

■ The terms of office of bankruptcy judges did not end on June 27, 1984, as opponents assert, but continued at least until July 10, 1984 by operation of holdover provisions in Sections 404(b) and (d) of the Bankruptcy Act of 1978, as amended [P.L. 95–598, 92 Stat. 2683–85 (the "1978 Act")], until the appointment of their successors.

The holdover provisions of the 1978 Act expressly authorize bankruptcy judges to serve beyond the expiration of the transition period. As officeholders on July 10, 1984, pursuant to the holdover provisions of prior law, the bankruptcy judges were properly continued in office, by Section 106(a), without reliance on any retroactive application of Section 121(e) of the 1984 Act.

■ It is a basic and often applied precept that a statute must be construed, if at all possible, to avoid constitutional questions:[5]

When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided. [Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932)].[6]

---

4. Section 121(e) provided: "The term of office of any bankruptcy judge who was serving on June 27, 1984, is extended to and shall expire at the end of the day of enactment of this Act." Section 122(c) established June 27, 1984 as the effective date for Section 121(e).

5. It is deeply rooted doctrine of constitutional adjudication "not to pass on questions of constitutionality ... unless such adjudication is unavoidable" [New York Transit Authority v. Beazer, 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979), quoting, Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944)].

6. Accord, e.g., Ellis v. Railway Clerks, —— U.S. ——, ——, 104 S.Ct. 1883, 1890, 80 L.Ed.2d 428, 439 (1984); St. Martin Lutheran Church v. South Dakota, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981); Califano v. Yamasaki, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); International Machinists v. Street, 367 U.S. 740, 750–1, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961). The principle has been applied to avoid constitutional challenges, as here, predicated on the doctrine of separation of powers. See, e.g., McCulloch v. Sociedad Nacionel de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) (National Labor Relations Act construed to avoid conflict with role of

Contrary to the assumption of opponents the 1978 Act, originally and as amended, did not fix a finite term of office for bankruptcy judges. Rather, the 1978 Act enacted holdover provisions retaining bankruptcy judges in office after the expiration of the stated term (defined by reference to a particular date) until appointment of their successors.

For most bankruptcy judges, including in particular, Bankruptcy Judge King, the holdover provision is found in Section 404(b) of the 1978 Act, which originally provided: "The term of a referee in bankruptcy who is serving on the date of enactment of this Act is extended to and expires on March 31, 1984 *or when his successor takes office."* [P.L. No. 95–598, § 404(b), 92 Stat. 2683 (Emphasis supplied)]. For all remaining bankruptcy judges *i.e.* those appointed by the district courts during the transition period itself, the applicable holdover provision is found in Section 34(a) of the old Bankruptcy Act: "[u]pon the expiration of this term, a referee in bankruptcy shall continue to perform the duties of his office until his successor is appointed and qualifies" [11 U.S.C. § 62(a) (repealed)]. The old Bankruptcy Act provision was incorporated by Section 404(d) of the 1978 Act into the transitional scheme.

█ Thus, as initially enacted, the term of office of each bankruptcy judge was until the later of the scheduled expiration of the transition period, March 31, 1984, or until his successor took office. The four subsequent amendments[7] to Section 404 prior to the 1984 Act did not alter the successor or holdover provisions, but changed only the date of the expiration of the transition period and the corresponding stated expiration (as expressed by reference to a fixed date) of the term of all sitting judges.[8] Therefore, prior to the enactment of the 1984 Act, Section 404(b) of the 1978 Act, as amended by the extension statutes provided: the term of a referee in bankruptcy who is serving on the date of enactment of this Act is extended to and expires on June 27, 1984 or when his successor takes office. For transition appointees, the stated term also expired on June

---

Executive Branch in foreign relations); *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (narrower construction of Congressional grant of authority to the Secretary of State to avoid constitutional problem of improper legislative delegation of authority); *Ullmann v. United States,* 350 U.S. 422, 433, 76 S.Ct. 497, 503, 100 L.Ed. 511 (1956) (legislative history and construction of statute not to be read to raise serious question of the role of the Judicial Branch under the separation of powers doctrine); *See also Application of U.S. Senate Select Committee on Presidential Campaign Activities,* 361 F.Supp. 1270 (D.D.C.1973) (following reasoning in *Ullmann, supra,* and construing narrowly the powers of a district court under a witness immunity statute in order to avoid problems of usurpation by the Judiciary or Executive Branch's power).

These principles are firmly established in this Circuit. *See, e.g., Dawson v. Myers,* 622 F.2d 1304, 1309 (9th Cir.1980) ("cardinal principle ... that ... statutes should be construed to avoid constitutional questions"), vacated on other grounds, 451 U.S. 625, 101 S.Ct. 1961, 68 L.Ed.2d 495 (1981) (*per curiam* ); *Life Insurance Company of North America v. Reichardt,* 591 F.2d 499, 506 (9th Cir.1979) ("constitutional adjudication should be avoided wherever possible").

7. P.L. No. 98–249, 98 Stat. 116 (Mar. 31, 1984); P.L. No. 98–271, 98 Stat. 163 (Apr. 30, 1984);

P.L. No. 98–299, 98 Stat. 214 (May 25, 1984); P.L. No. 98–325, 98 Stat. 268 (June 20, 1984).

8. Each of the four extension statutes contains two sections. As relevant here, Section 1 of each of the statutes amended Section 404 of the 1978 Act by deleting the specified date for expiration of the transition period (amending Section 404(a)) and the specified date for expiration of the term of office (amending Section 404(b)). The second section of each statute also extended the terms of office of bankruptcy judges. For example, Section 2 of the March 31, 1984 extension statute provided: "the term of office of any bankruptcy judge who was serving on March 31, 1984 and of any bankruptcy judge who was serving on the date of enactment of this Act is extended to and shall expire on May 1, 1984." P.L. No. 98–249, § 2, 98 Stat. 116. Other than changes in the relevant dates, each of the subsequent extension statutes was identical.

Opponents would have us disregard the express amendments to 404(b) in Section 1(b) of the extension statute and consider only the extension of term of office contained in Section 2, quoted above. But the amendment to Section 404(b) cannot be disposed of so easily. Section 1(b), and its amendment to Section 404(b), and Section 2 are fully reconcilable. The amendment to Section 404(b) in Section 1(b) of each of the extension statutes applies to those bankruptcy judges, like Bankruptcy Judge King,

27, 1984 but the right to holdover incident to those appointments remained in effect pursuant to old Section 34(a) [11 U.S.C. § 62(a) (repealed)].

During the period from June 27, 1984 to July 10, 1984 no bankruptcy judges were appointed. Therefore by virtue of the two parallel holdover provisions, all bankruptcy judges in office on June 27, 1984 including Judge King, were in office on July 10, 1984. At that time, by virtue of Section 106(a) of the 1984 Act the terms of office of all bankruptcy judges sitting on that date were further extended until four years after the date such bankruptcy judge was last appointed to such office or on October 1, 1986, whichever is later.

■ In construing a statute, it is fundamental that the statute be construed to give effect to all of its provisions, rendering no part inoperative or superfluous, unnecessary or inapplicable [*Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973)]. Construing the "successor" language in Section 404(b) of the 1978 Act as a provision for holding office after the date fixed in that statute may not be the sole possible construction; but in adherence to the deeply-rooted doctrine of avoiding constitutional problems, [*New York Transit Authority v. Beazer,* 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979)], it is the only *permissible* construction here. By parallel reasoning, the holdover language of the old Section 34(a) must be construed to apply to bankruptcy judges appointed during the transition pursuant to Section 404(d), as that latter section expressly provides.

who—as expressly set forth in Section 404(b)— were referees in bankruptcy at the time of enactment of the 1978 Act. Section 2 of each of the extension statutes applies to all other bankruptcy judges (*i.e.,* those appointed during the transition period) whose express term would otherwise have expired on March 31, 1984 (but who, as noted above, held office pursuant to Section 34(a) of the old Bankruptcy Act, 11 U.S.C. § 62(a), until appointment of successors.

In any event, one thing is clear. The "extension" amendments did not affect the "holdover" provisions applicable to all bankruptcy judges. Section 1(b) amended Section 404(b) but expressly left unamended the "successor" language

These interpretations are buttressed by the legislative history of the 1978 Act which establishes that at the time of enactment of the 1978 Act Congress was concerned about and wished to avoid the serious disruption of the bankruptcy system (urged by opponents) that would result from prolonged vacancies in the office of bankruptcy judges.

Although the original House version [9] of the 1978 Act omitted any holdover provision, the Senate bill [10] explicitly authorized sitting bankruptcy judges to hold over after the expiration of the transition period until their successors were ready to take office as "[s]afeguard[s] against possible delays in the replacement of the bankruptcy judges and service at the end of the transition period" [S.Rep. No. 989, 95th Cong., 2nd Sess. 166 (1978), *reprinted,* 1978 U.S.Code Cong. & Ad.News 5787, 5952]. The language of Section 404(b), as enacted, differs slightly from the Senate proposal, but still manifests Congressional intention to incorporate a holdover provision to insure continuity of service at the expiration of the transition period. This intention is reinforced by the parallel enactment of a holdover provision for transition period appointees through the incorporation in Section 404(d) of the explicit holdover provision of Section 34(a) of the old Bankruptcy Act [11 U.S.C. § 62(a)].

Certainly, despite enacting these safeguards, Congress hoped that the provisions would prove unnecessary. Nevertheless, the Congress appropriately and cautiously enacted holdover provisions to apply in the event that its expectations were not met.

in Section 404(b); neither Section 1 nor Section 2 deleted the "successor" language in Section 34(a) of the old bankruptcy act.

9. H.R. 8200, the original House bill, would have established the new bankruptcy court as an Article III court. Therefore, a holdover provision was omitted out of concern whether non-Article III judges could constitutionally be "held over" to fill office as Article III judges with lifetime tenure. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 290 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6246.

10. Section 402(b) of the Senate bill extended the terms of office of sitting referees to the end of

## IV.

■ Even if we assume that the terms of office of all bankruptcy judges in fact expired on June 27, 1984, and that it is only by operation of Sections 106(a) and 121(e) of the 1984 Act that bankruptcy judges hold office today, the legislation is nonetheless valid as a permissible retroactive *extension* of bankruptcy judges' terms, and is not an invalid legislative "appointment".[11] Nothing in the 1984 Act usurps, impairs or infringes upon the rights and responsibilities of a coordinate branch (here, the judiciary) to select or choose individuals to hold office as bankruptcy judges. Everything under the 1984 Act is within the constitutional power and right of Congress to create the office, establish and modify its scope and term, and designate officers previously appointed by the judiciary to remain in office. Within the practical realities of the Constitution, no violation of the Appointments Clause or the principle of separation of powers is implicated.

■ Constitutional history and the decisional law construing the Appointments Clause establish that Congress creates the office and determines its duties and duration, but that for inferior offices Congress places responsibility to select the qualified individual on the Executive or the Judiciary. The constitutional history and decisional law further establish that the Appointments Clause and the doctrine of separation of powers which it embodies are

honored so long as selection of the qualified officeholder is exercised by a branch other than the Legislature. Provided that selection is made by another branch, the exercise by Congress of its power to modify the term of office or the duties of the officeholder is constitutional.

These principles were followed here. Congress did not select, and therefore did not "appoint", any one or all of the bankruptcy judges now in office. Rather, Congress modified the terms of office and nature of office of all bankruptcy judges previously appointed by the district courts who were in office as of June 27, 1984. By selecting no one to be added to, or subtracted from, the bankruptcy judges in office on June 27, Congress filled no vacancy—and created no vacancy—in the office of bankruptcy judge.[12]

The Constitution expressly grants Congress the authority to create offices, the responsibility to advise and consent for higher offices, and the power to vest appointment to inferior offices, as applicable here, in the President, the Head of a Department or the Courts of Law:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by

the transition period, except for referees found not qualified at the end of their appointed statutory term. Section 402(d) of the bill provided: "Each referee in bankruptcy shall upon the expiration of his term of office continue to serve until a successor is appointed and qualified...." Subsection (d) authorizes "an incumbent referee in bankruptcy, upon the expiration of a regular *or· an extended term of office,* to continue to serve...." S.Rep. No. 989, 95th Cong., 2nd Sess. 166 (1978) (Emphasis supplied), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5952.

**11.** Because of the interplay of Sections 106(a) and 121(e) the nature of the constitutional challenges to each are related, but different. Section 121(e) alone speaks retroactively, *i.e.,* from June 27 to July 10, the date of enactment of the 1984 Act. Section 106(a) has prospective effect

only, *i.e.,* from July 10, 1984 to at least October 1, 1986.

The debtor challenges both the retroactive extension of the term of office contained in Section 121(e) and the prospective extension of office contained in 106(a). This second argument has no merit. We will demonstrate, *infra,* that—as the Executive Branch concedes—the Appointments Clause grants Congress the right, which it exercised here, to specify added duties reasonably related to the duties of the position to which the officer was originally appointed.

**12.** Those vacancies in the office of bankruptcy judge that existed on June 27, 1984 continued to exist at least until July 10, 1984 when Congress vested in the courts of appeals, pursuant to Section 152 of the 1984 Act, the power to select individuals for those vacancies.

Law: but the Congress may by Law vest the Appointment of such inferior officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments. [Art. II, § 2, Cl. 2. of the United States Constitution]

The language of the Constitution thus makes it clear that the appointment power was not granted exclusively to one branch. Rather the Constitution distributes the component powers of appointment among the branches of government to best accomplish the ends of responsible and secure appointment of officers [*Myers v. United States*, 272 U.S. 52, 128, 47 S.Ct. 21, 29, 71 L.Ed. 160 (1926)].

■ The broad power which Congress has to create offices of the United States under the Necessary and Proper Clause of the Constitution, Article I, § 8, cl. 18, includes the power to prescribe the term of the office, the duties and scope of authority of the office and the qualifications of individuals eligible for selection to the office [*Buckley v. Valeo*, 424 U.S. 1, 120–148, 96 S.Ct. 612, 682–695, 46 L.Ed.2d 659 (1976)].[13] This power of Congress to change the scope and term of office is long-established.

In *Crenshaw v. United States*, 134 U.S. 99, 10 S.Ct. 431, 33 L.Ed. 825 (1890), a naval midshipman challenged a statute on the grounds that Congress exceeded its authority under the Appointments Clause in two respects: (1) by filling the office, and, (2) by shortening the term of office

before the expiration of the incumbent's designated term. The Court upheld Congress' action. In response to the first of these challenges, the Court reasoned:

"Congress did not ... undertake to name the incumbent of any office. It simply changed the name, and modified the scope of the duties. This, we think it had the power to do." [*Id.* at 109, 10 S.Ct. at 434].

Approving a line of earlier state and federal cases sustaining the legislative power to abolish offices prior to the expiration of the terms of their incumbents, the Court also rejected the second challenge:

The legislative power of a State, except so far as restrained by its own Constitution, is at all times absolute with respect to all offices within its reach. It may at pleasure create or abolish them, or modify their duties. *It may* also shorten or *lengthen the term of service.* And it may increase or diminish the salary or change the mode of compensation. [*Id.* at 105–6, 10 S.Ct. at 433 (quoting *Newton v. Board of County Comm'rs*, 10 Otto 548, 559, 100 U.S. 548, 559, 25 L.Ed. 710 (1890) (Emphasis supplied). *See also Lewis v. United States.* 244 U.S. 134, 37 S.Ct. 570, 61 L.Ed. 1039 (1917); *Butler v. Pennsylvania*, 10 How. 402, 13 L.Ed. 472 (1850) (cited with approval in *Crenshaw*)].

A related line of cases addresses Congress' power to limit or otherwise affect the removal of officers before the expiration of their designated terms. In *Myers v.*

---

**13.** *Buckley v. Valeo*, upon which opponents place major reliance, is so different from the present case as to be of little, if any, functional utility here. First, *Buckley* represents a case where the Congress expressly reserved to itself the power to "appoint" officers after enactment of the statute. Thus in *Buckley*, unlike here, Congress expressly sought to select or choose which individuals would subsequently be placed in office. In *Buckley,* neither the President, the head of any department, nor the Judiciary had any voice in the selection of four members of the Federal Election Commission [424 U.S. at 127, 96 S.Ct. at 686]. Congress directly arrogated to itself authority clearly prohibited to it by the Appointments Clause [*Id.* at 135, 96 S.Ct. at 689].

Second, to the extent *Buckley* is relevant here, the relevance lies in the analysis which the

Supreme Court adopted in reaching its determination. The Court looked beyond the literal language of the Appointments Clause to its development and its purpose in the Constitution. The principal concern of the Framers was "fear that the Legislative Branch ... will aggrandize itself at the expense of the other two branches." [*Id* at 129 and Note 166, 96 S.Ct. at 687 and Note 166]. Analyzing the decisional law, the Court identified the existence of Congressional action impairing the authority and independence of another branch as determinative of a violation under the Appointments Clause [*See id* at 119, 135–36, 96 S.Ct. at 682, 689–90]. Application of that same analysis of constitutional history reveals no Congressional intent to augment its power or to reduce the power of the correlative branches.

*United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), the Court ruled that Congress was precluded from limiting the President's power to fire a postmaster appointee. However, less than ten years later, the court sharply limited *Myers* in *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), holding that the limitation on Congress' power to preclude or limit the President's power of removal applies only to "purely executive officers" [*Id.* at 627–628, 55 S.Ct. at 873–74]. More recently, in *Weiner v. United States*, 357 U.S. 349, 352, 78 S.Ct. 1275, 1277, 2 L.Ed.2d 1377 (1958), the Court reaffirmed Congress' removal power over inferior federal officers.

■ The removal cases substantiate the analysis of the exercise of power with respect to the different components of the appointment process. Congress must honor another branch's authority to select, and cannot usurp or impair that authority. Thus, in *Myers, supra,* the court recognized that Congress' power to prescribe qualifications to office did not violate the Appointments Clause so long as "[t]he qualifications do not *so limit selection* and *so trench upon executive choice* as to be in effect *legislative designation*" [*Myers v. United States*, 272 U.S. at 128, 47 S.Ct. at 29 (Emphasis supplied)]. However, when Congress does not place limits on selection, but, as here, only modifies the time in office of an individual selected by another branch, there is no constitutional problem.

Another line of cases under the Appointments Clause is even more instructive and relevant here. In *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), Congress created a five-member Public Parks Commission for the District of Columbia, comprised of the Chief of Engineers of the United States Army, the Engineer Commissioner of the District of Columbia, and three individuals to be appointed by the President with the advice and consent of the Senate. Rejecting the contention that the designations of the two named officers constituted an improper congressional appointment under the Appointments Clause, the Court reasoned:

> As ... the two persons whose eligibility is questioned were at the time of passage of the act and of their action under it officers of the United States who had been theretofore appointed by the President and confirmed by the Senate, we do not think that, because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary that they should be again appointed by the President and confirmed by the Senate. It cannot be doubted, and it has frequently been the case, that Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed. [*Id.* at 301, 13 S.Ct. at 391] [*Cf. Springer v. Philippine Islands*, 277 U.S. 189, 202, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928)]. (Court held invalid enactments by the Philippine Territorial Legislature which was subject to a provision held to be identical in scope to the Appointments Clause) setting up several government corporations and providing that certain legislative officers should serve *ex officio* as directors of those corporations; the Legislature, the Court noted, may not "engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; *though the case might be different if the additional duties were devolved upon an appointee of the executive*". (Emphasis supplied).[14]

■ Accordingly, under *Shoemaker,* the Appointments Clause imposes only two

---

**14.** Similarly, in *Geiger v. Tacoma Ry. & Power Co.,* 141 F. 169 (W.D.Wa.1905), the constitutional challenge arose from the division of the State of Washington into two judicial districts. In its haste to create the newly formed district courts, Congress enacted legislation providing that the district judge, as well as other officers of the court, were to serve in both district courts. Rejecting the challenge, the Court in *Geiger* held that "The assignment of the District Judge to serve as judge of a district thus reduced is not the same thing as an attempt to make an original appointment of a particular person to a newly created office by an act of Congress, and does not violate the Constitution." [*Id.* at 178].

conditions on Congress' power to expand an officer's duties or tenure. First, the officer whose duties or tenure are to be expanded must have originally been appointed in a manner comporting with the Appointments Clause. This test is certainly passed here, as all bankruptcy judges were district court appointees. Second, the officer's new duties must be "germane" to the duties for which the officer was originally appointed. This test, too, is passed.

■ "Germane" in this context means "not dissimilar to or outside the sphere of" the officer's original duties [*Shoemaker v. United States*, 147 U.S. at 301, 13 S.Ct. at 391]. It cannot be seriously contended that the bankruptcy judges' duties under the 1984 Act are not "germane" to the prior duties. Nor can it be seriously contended that the 1984 Act has "created" new offices by substantially augmenting the duties of bankruptcy judges.

Accordingly, under *Shoemaker* and its progeny, it is clear that Congress acted properly and without violating the Appointments Clause in prospectively extending the terms of office of bankruptcy judges in Section 106(a) in the 1984 Act.

## V.

The final question to be addressed—and the one on which opponents' principal constitutional challenge hinges—is whether the retroactivity of Section 121(e) of the 1984 Act, providing for the retroactive extensions of the terms of bankruptcy judges from June 27, 1984 to July 10, 1984, somehow runs afoul of the Appointments Clause. The answer to that question is in the negative.

Opponents, in their attack on the validity of Sections 106(a) and 121(e) of the 1984 Act, do not argue that Congress' four extensions of the transition provisions of the 1978 Act in any way violated the Appointments Clause. Nor do they argue that the four-and-one-half year extension of office during the transition period violated the Appointments Clause.

Opponents do argue that the limited, curative, retroactive extension of the bankruptcy court system and the bankruptcy judges' offices, effected by Section 121 of the 1984 Act, is violative of the Appointments Clause, solely because this Section was enacted on July 10, 1984, thirteen days after the last prior extension had elapsed. Given the identical *effect* of Congress' concededly valid prospective extensions, on the one hand, and the challenged retroactive extension, on the other, given Congress' plenary power to modify the term and scope of office, and given Congress' broad power to pass laws with retroactive effect, this contention of invalidity is of course inherently suspect.

The constitutional challenge is ultimately grounded on the argument that, because Congress (and, presumably, the President) had not acted by the close of business on June 27, 1984 to extend further the then-sitting bankruptcy judges' terms of office, Congress was powerless to take any action after that date, no matter how formulated, without "creating" a new office and triggering new "appointments" under the Appointments Clause. This argument rests entirely on a chronologically determinative Appointments Clause "test" without support in law or logic. The analysis of opponents disregards the plenary power of Congress with respect to offices, discussed above, and ignores well-settled retroactivity principles. Equally important, the analysis wholly ignores the separation of powers principles that underlie—and have formed the Supreme Court's interpretation of—the Appointments Clause.

■ That Congress may constitutionally pass laws with retroactive effect cannot be seriously questioned. Indeed, the only limitation on Congress' power to enact legislation with retroactive effect is identical to the limitation on Congress' power to enact legislation with prospective effect, *i.e.*, Congress may enact legislation pursuant to its Article I powers so long as it does not violate some express restraint imposed by the Constitution [*See, e.g., Pension Benefit Guaranty Corporation v. R.A. Gray & Co.*, —— U.S. ——, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *United States v. Darusmont*, 449 U.S. 292, 101 S.Ct. 549, 66

L.Ed.2d 513 (1981); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)].

█ Virtually all of the reported cases involving constitutional challenges to the retroactive application of legislation arise under the Due Process Clause. In these Due Process cases, the Court has consistently held that if the retroactive application of the statute is a rational means to furthering a legitimate legislative purpose, the retroactive application is constitutional.[15] Further, in the Due Process Clause context, at least, the Court has held that the retroactive application of a statute is unconstitutional only if it is particularly "harsh and oppressive" [*Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 125, 83 L.Ed. 87 (1938)].

The Due Process cases demonstrate the breadth of Congress' power to enact legislation having a retroactive effect. Further, the Due Process cases indicate that in considering the constitutionality of Congress' exercise of its Article I powers to legislate retroactively, the purpose of the challenged retroactive provision must be balanced against the extent of encroachment, if any, on the alleged competing provisions of the Constitution. On the present facts, this, of course, requires a reasoned analysis of the extent, if any, to which Section 121(e) of the 1984 Act encroaches upon the separation of powers principle embodied in the Appointments Clause.

In support of their argument opponents rely on authority which, to the extent relevant here, fully supports the power of Congress to retroactively extend the terms of office. They cite three 19th-century cases involving attempted presidential reappointments of military officers [*United States v.*

*Corson,* 114 U.S. 619, 5 S.Ct. 1158, 29 L.Ed. 254 (1885); *Blake v. United States,* 10 Otto 227, 103 U.S. 227, 26 L.Ed. 462 (1880); *Mimmack v. United States,* 7 Otto 426, 97 U.S. 426, 24 L.Ed. 1067 (1878)]. In each case, an officer had either resigned his commission or been dismissed from service, and the President attempted to "reinstate" the officer by revoking acceptance of the resignation or the dismissal order. The attempted reinstatement was to an office for which the appointment power was vested in the President with the advice and consent of the Senate, and the Supreme Court held in each case that the President could not reinstate the individual to office unilaterally.

These cases are plainly distinguishable from the present facts in several critical respects. First, the office at issue in each case was an office to which appointment required the advice and consent of the Senate. With respect to these offices the President could only "nominate", and with the advice and consent of the Senate "appoint". Unlike the Congress—which alone can extend an office—the President in this case could not alone "appoint". Without Senatorial action, lacking in each of the cases, the President was powerless to act.

█ Second, each of these cases involves an officer leaving office, not, as here, the extension of the term of the office permitting the incumbent to remain as an officer. As the cases above uniformly recognize, control over the term of office is uniquely that of Congress. By contrast, reappointment to the office, whether express or implicit, must conform to the constitutionally mandated method for appoint-

---

**15.** *E.g., Pension Benefit Guaranty Corporation v. R.A. Gray & Co., supra,* —— U.S. ——, 104 S.Ct. 2709 (Court sustained ERISA provision imposing liability on an employer for withdrawal from a multi-employer pension plan which took place prior to enactment of the statute and, accordingly, was permissible at the time); *United States v. Darusmont,* 449 U.S. at 296–97, 101 S.Ct. at 551–52 (Court sustained tax law imposing tax liability on transactions effective prior to enactment of the statute; Court noted that retroactive provisions in tax laws for "short and

limited periods" are "a customary congressional practice" which are "required by the practicalities of producing national legislation"); *Usery v. Turner Elkhorn Mining Co., supra,* 428 U.S. 1, 96 S.Ct. 2882 (Court upheld legislation retroactively imposing financial liability on employers for work related diseases). *See also Lichter v. United States,* 334 U.S. 742 (1948); *Fleming v. Rhodes,* 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947); *Carpenter v. Wabash Ry. Co.,* 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558 (1940).

ment. In those cases, the requisite advice and consent was absent.

Third, the fact that the President cannot appoint retroactively to an office requiring advice and consent of the Senate, at least without such advice and consent, does not either logically or legally support the proposition advanced by opponents that the Congress cannot extend retroactively an office which it could unilaterally have extended prospectively.

Nor do opponents find support in *Staebler v. Carter*, 464 F.Supp. 585 (D.C.1979), cited for the proposition that the expiration of a term "triggers" the appointing power. All that was involved there was the statutory construction of a "holdover" provision permitting members of the Federal Elections Committee to remain in office after the expiration of their stated term until appointment of a successor. Under the statute, as the district court recognized, the expiration of the stated term began the period when the appointment process could commence, but it did *not* automatically "trigger" the ouster of the "holdover" appointee from office. If *Staebler* has any application here, it lies in its confirmation of the principle heretofore recognized, that the bankruptcy judges remained in office after expiration of their stated term, in accordance with Section 404 of the 1978 Act, until their offices were further extended by Section 106(a).

*Parson v. United States*, 167 U.S. 324, 17 S.Ct. 880, 42 L.Ed. 185 (1897), and *Martin v. Tobin*, 451 F.2d 1335 (9th Cir.1971), cited by opponents for the proposition that the expiration of a specified term of office marks the outside limit of tenure of the officeholder, are not pertinent here. Both cases involve the right to remove from office before the expiration of the stated term, holding that such term did not establish a minimum term before removal could take place. Whether the officer would remain in office at the end of the stated term, either automatically or, as here, through retroactive extension of office, is not addressed in either case.

Congress, of course, may not enact legislation having retroactive effect if such retroactive application would violate some other restraint imposed by the Constitution.

*United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), was a Compensation Clause case, involving a challenge to the authority of Congress to enact legislation which set aside or reduced previously authorized salary increases to Article III judges. The Supreme Court framed the issue as "[w]hen, if ever, does the Compensation Clause prohibit Congress from repealing salary increases that would otherwise take effect automatically" [*Id.* at 221, 101 S.Ct. at 483]. The Court held the answer dependent upon when such increases "vested" [*Id.* at 221–230, 101 S.Ct. at 483–488].

The relevance of *United States v. Will* does not lie in its holding or its analysis of retroactive legislation. In fact, the case nowhere addresses retroactivity. Rather, *United States v. Will* and its holding that Congress may not "divest" salary increases under the Compensation Clause provide a backdrop against which to examine prior cases where, under the Compensation Clause the question of "diminution"—as here, under the Appointments Clause, the question of "appointment"—had to be examined not literalistically but fundamentally to see if principles of separation of power were violated.

The relevant line of cases involves challenges to federal income tax statutes on the ground that the statutes constituted action which "diminished" the salary of Article III judges in violation of the Compensation Clause. The first of these cases was *Evans v. Gore*, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920). After a detailed discussion of the purpose and history of the Compensation Clause—which, of course, focused on the separation of powers principles embodied in the Clause—the Court declared the imposition of the income tax to be invalid, reasoning that "[c]ompensation [as a judge] is protected from diminution in any form, whether by a tax or otherwise" [*Id* at 263, 40 S.Ct. at 556]. Five years

later, in *Miles v. Graham*, 268 U.S. 501, 45 S.Ct. 601, 69 L.Ed. 1067 (1925), another judge, this time one appointed after enactment of the relevant legislation, challenged application of the income tax statute to him. Relying on *Evans*, the Court held that the compensation of a judge is protected against diminution: "[t]here is no power to tax a judge of the Court of the United States on account of the salary prescribed to him by law" [*Id* at 508–09, 45 S.Ct. at 602].

However, in the last of this line of cases, *O'Malley v. Woodrough*, 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289 (1939), the Supreme Court revisited the interplay of the Compensation Clause and the income tax. Noting that the separation of powers analysis in the Compensation Clause cases had met "[w]ith wide and steadily growing disfavor from legal scholarship and professional opinion" [*Id* at 281, 59 S.Ct. at 839], the Court rejected that earlier analysis and held the imposition of a nondiscriminatory tax on a federal judge not to be

> [a] diminution of his salary within the prohibition of Article III, § 1 of the Constitution. To suggest that it makes inroads upon the independence of judges who took office after Congress had thus charged them with the common duties of citizenship, by making them bear their aliquout share of the cost of maintaining the Government, is to trivialize the great historic experience on which the Framers based the safeguards of Article III, § 1. [Id at 282, 59 S.Ct. at 840].

The significance of this line of cases, of course, lies in the express balancing of the purpose and effect of Congress' exercise of its Article I and Sixteenth Amendment taxing powers against the alleged encroachment on the Compensation Clause. No one disputes that a tax imposed on a judge's salary necessarily diminishes that judge's compensation, as the Court concluded in the first two cases. Yet by the time of the last of these cases, the Court was compelled to take a fresh look at the principles underlying the Compensation Clause and, in light of the common sense and fundamental values at stake, reinterpret the meaning of that Clause.

Because the imposition of the income tax on judges' salaries did not in any meaningful sense encroach upon the independence of federal judges—which independence is precisely what is protected by the separation of powers principle embodied in the Compensation Clause—the Court opted for a principled, rather than a literalistic interpretation of the Clause. By application of parallel reasoning here, the retroactive extension of office of bankruptcy judge can in no principled way be said to encroach upon the separation principles embodied in the Appointments Clause. Only a "literalistic" approach, as suggested by opponents, would transform what Congress could undeniably do prospectively—extend offices—into a creation of a new office when done retrospectively, despite no greater effect on or intent to impair the rights of a coordinate branch.

*Freeborn v. Smith*, 2 Wall. 160, 69 U.S. 160, 17 L.Ed. 922 (1864), in its analysis of separation of powers in the context of expressly retroactive legislation by Congress, is even more instructive on the issues before us. The principal issue in *Freeborn* was whether a retroactive statute conferred jurisdiction on the Supreme Court. The case arose from the admission of Nevada as a state and the omission of Congress in the relevant legislation to provide for the disposal of the pending cases on appeal from the territorial courts. After the appellee initially moved to dismiss the appeal, hearing on the motion was postponed, "[i]n order that omission to provide for such cases in the original Act might be supplied by further legislation of Congress." [*Id*, 69 U.S. at 174, 17 L.Ed. at 923].

After Congress passed corrective legislation authorizing the Supreme Court to hear that and similar appeals, the appellee renewed its argument for dismissal. The Supreme Court rejected the first argument, challenging the retroactive legislative power of Congress:

What obstacle was in the way of legislation to supply the omission to make provision for such cases in the original Act? If it comes within the category of retroactive legislation, as has been argued, we find nothing in the Constitution limiting the powers of Congress to amend or correct omissions in previous Acts. [69 U.S. at 174, 17 L.Ed. at 923].

The Court next addressed appellee's further argument that the original Act of admission to statehood, by initially divesting the Court of jurisdiction, was in legal effect equivalent to affirmance of the judgment below or that the curative legislation was akin to a grant of reargument:

The omission to provide for this accidental impediment to the action of this court, did not necessarily amount to the affirmance of the judgment .... "[t]he Legislature which, in its Acts, not expressly authorized by the Constitution, limits itself to correcting mistakes and to providing remedies for the furtherance of justice, cannot be charged with violating its duty, or exceeding its authority." (Citation omitted) Such Acts are of a remedial character, and are peculiar subjects of legislation. *They are not liable to the imputation of being assumptions of judicial power.* [69 U.S. at 175, 17 L.Ed. at 923–24 (Emphasis supplied)].

By the same logic and application of common sense, the retroactive extension of office here is no more an "appointment" to office invoking the power of another branch than the retroactive legislation in *Freeborn* was a "judgment" invoking the judicial power.

Tested by these principles of constitutional analysis, the 1984 Act is well within the long established constitutional limits of Congressional power and does not violate the letter or spirit of the Appointments Clause or the separation of powers doctrine it embraces:

The doctrine of separation of powers, though essential to the nature of our constitutional system, is not set forth explicitly in the Constitution, as it is in the constitutions of some of the states. It is implied in the federal system. Largely for this reason its boundaries are not rigid or clearly ascertainable in all situations. *See Ex parte Siebold, supra* [10 Otto 371 at 397] 100 U.S. [371] at 397 [25 L.Ed. 717]. [*Hobson v. Hansen,* 265 F.Supp. 902, 915 (D.D.C.1967)].

■ Separation of powers is a safeguard against the tyranny of one branch usurping the total power of another branch. In *The Federalist* No. 47, Madison examines the theory of Montesquieu, the oracle who was always consulted and cited on this subject, and writes:

[Montesquieu's] meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted.[16] [*United States v. Solomon,* 216 F.Supp. 835, 839 (S.D.N.Y.1963) (Emphasis in original)].

Justice Jackson succinctly described the separation of powers doctrine:

The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clause or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also

---

**16.** "When we speak," said Story, "of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution." *Dreyer v. Illinois,* 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902).

contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. [One branch's] powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of [another branch]. [*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)].

Certainly, Mr. Justice Jackson's formulation confirms that the need for "a workable government" justifies the retention of interim or transitional bankruptcy judges to preserve the bankruptcy system despite the passage of less than two weeks from the expiration of the 1978 Act until the enactment and effectiveness of the 1984 Act. Here, Congress acted in express conjunction with its coordinate branches. The selection of all bankruptcy judges whose terms of office were extended by the 1984 Act was a responsibility performed by the district courts under prior law, not that of Congress. Congress expressly recognized in Section 106(a) of the 1984 Act that it was not "appointing": the extension of the terms of office until October 1, 1986 or for four years after their last "appointment" would make no sense if Congress viewed its actions effective on July 10, 1984 as a new "appointment" for a thereby new minimum of four years. Further, Congress vested the power of appointment (selection) —and removal—of bankruptcy judges in the Courts of Appeals pursuant to Section

152 of the 1984 Act, effective immediately for vacancies in office.

Finally, the fact that the President signed the 1984 Act into law is relevant under Mr. Justice Jackson's analysis of separation of power. The point is not that the President thereby "appointed", but rather that the exercise of Congressional power in enacting the 1984 Act was in "conjunction", not "disjunction", with the power of the Executive. Thus, unlike *Buckley v. Valeo, supra,* the case upon which opponents place heavy reliance, Congress did not reserve for itself the power to select in the future individuals to be appointed, but rather, in conjunction with the Executive Branch, extended the terms of office of individuals previously selected in accordance with prior law by the judiciary.

The power to extend office exercised here under the Appointments Clause is either that of Congress alone or, at worst, in the "zone of twilight" where the branches have concurrent authority and where "[a]ny actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than abstract theories of law." [*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring)]. Sections 121(e) and 106(a) of the 1984 Act certainly pass that test.[17]

In the last analysis, Congress, by exercising its well-settled power to pass laws with retrospective effect for a legitimate purpose, has properly extended the terms of

---

**17.** The Supreme Court's decisions in *Northern Pipeline* and *Bildisco,* to which Congress was responding in large part with the 1984 Act, and the difficulties in resolving the differences between the houses in the form that response should take, are certainly "imperatives of events." The degree of chaos and disruption in the bankruptcy system which would result from the termination of office of all sitting bankruptcy judges is certainly a "contemporary imponderable". Confronting these "imperatives" and "imponderables", Congress was justified in extending the terms of office, even retroactively, as here, to achieve a smooth transition to the new bankruptcy system. By doing so, Congress: (1) preserved the collective experience and expertise of the over 200 bankruptcy judges in

office; (2) recognized the substantial contributions of the bankruptcy judges in office to the bankruptcy system; (3) acknowledged the continued service by bankruptcy judges during the transition period, including during the extensions thereof, despite uncertainty as to the nature of the office, and for how long bankruptcy judges would continue in office after the transition period; (4) reduced to a minimum the disruption of individual bankruptcy cases that would be caused by placing bankruptcy cases on already overburdened district court dockets; and (5) accorded the Courts of Appeals a period of time in which to screen and select the most capable and qualified individuals for appointment as bankruptcy judges.

those duly appointed bankruptcy judges sitting on June 27, 1984. The *effect* of Section 121(e) of the 1984 Act is to continue in office all properly appointed judicial officers, and not to select or appoint a single new individual to judicial office. To conclude that Congress' retroactive extension of bankruptcy judges' terms constitutes new "appointments" would, in the words of the Supreme Court, be to "trivialize the great historic experience on which the Framers based the safeguards" of the Appointments Clause.

### VI.

The motion of the Debtor for a declaration that the 1984 Act is unconstitutional and the vacating of the general Reference Order in this district is denied. We need not reach the constitutional challenge presented here, because the holdover provision in the 1978 Act operated to maintain all incumbent bankruptcy judges in office beyond June 27, 1984 until the effective date of the 1984 Act. However, if we were to reach the constitutional challenge to Section 121(e) of the 1984 Act, we would hold that statute to be appropriate retroactive legislation, consistent with and in adherence to the Appointments Clause.