The Honorable Keith M. LUNDIN,
et al., Appellants,

v.

L. Ralph MECHAM, Appellee.

No. 91–5314.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 14, 1992.

Decided Dec. 1, 1992.

Rehearing Denied Feb. 3, 1993.

Adam Walinsky, New York City, with whom Bernard E. Goodman, Vienna, Va., was on the brief, for appellants.

Irene M. Solet, Atty., U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Douglas N. Letter, Atty., U.S. Dept. of Justice, Washington, D.C., were on the brief, for appellee. Lowell V. Sturgill and Michael J. Singer, Attys., U.S. Dept. of Justice, Washington, D.C., entered an appearance for appellee.

Before: MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

On July 20, 1984, six federal bankruptcy judges (the "Six Judges") filed suit in District Court against the Director of the Administrative Office of the United States Courts (the "Director"), challenging the Director's declaration that the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "Bankruptcy Act") violated the Appointments Clause of the Constitution. Over four years later, on November 29, 1988, the case was finally dismissed as moot. In the interim, a number of other cases involving the same or related issues were pursued by other parties in other federal courts across the country. The present appeal arises out of the Six Judges' request for attorney's fees under the Equal Access to Justice Act ("EAJA") incurred in prosecuting the suit that they filed in this District Court in 1984, and also for their

efforts as intervenors and *amicus curiae* in the "related cases." [1]

The District Court denied the request for fees, holding that the Director's position was substantially justified and that, alternatively, the Six Judges did not prevail in their suit below. Moreover, the District Court concluded that the Six Judges could not, under any circumstances, recover fees in this District Court for litigation expenses incurred in the related cases. While we agree that this court may not award fees under EAJA for work done in the related cases, we hold that the District Court erred in concluding that the Six Judges are not entitled to relief for their litigation expenses below. Thus, we affirm in part, reverse in part, and remand to the District Court for determination of the sum due the Six Judges for their work in this case.

## I. BACKGROUND

### A. *Legislative Framework*

On June 28, 1982, the Supreme Court held the Bankruptcy Reform Act of 1978 (the "1978 Act") unconstitutional. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Under prior legislation, federal district courts were empowered to appoint referees for six years or until a successor to the referee was appointed and qualified. 11 U.S.C. § 62 (repealed). The 1978 Act, Pub.L. No. 95–598, 92 Stat. 2549, completely revamped this scheme. Under the 1978 Act, bankruptcy "judges" replaced the former bankruptcy referees. The new judges were to be appointed by the President, with the advice and consent of the Senate, for fourteen-year terms, and were removable by the Judicial Council of the circuit for incompetency, misconduct, neglect of duty, or physical or mental disability. 28 U.S.C. §§ 151(a), 152, 153 (1978) (repealed). The 1978 Act broadened the jurisdiction of the new bankruptcy courts to include all claims by or against the bankrupt debtor. *Id.* at § 1471(b). Moreover, the new "bankruptcy courts" were given many of the powers associated with Article III Courts. For instance, the new bankruptcy judges could hold jury trials and issue declaratory judgments and writs of *habeas corpus. Id.* at §§ 1480, 2201, 2256.

The 1978 Act also provided for a transition period until March 31, 1984, during which time the existing courts of bankruptcy were continued. Pub.L. No. 95–598, § 404, 92 Stat. 2549, 2683 (1978). The terms of the bankruptcy judges were concomitantly extended. Specifically, the 1978 Act contained two holdover provisions. The first, section 404(b), provided: "[t]he term of a referee in bankruptcy who is serving on the date of enactment of this Act is extended to and expires on March 31, 1984 or when his successor takes office." The second, section 404(d), incorporated the language of the prior bankruptcy statute that provided: "[u]pon the expiration of his term, a referee in bankruptcy shall continue to perform the duties of his office until his successor is appointed and qualifies." The Supreme Court, in a plurality opinion by Justice Brennan, struck down the statute, concluding that the 1978 Act unconstitutionally conferred the essential attributes of judicial power on non-Article III tribunals. *Northern Pipeline*, 458 U.S. at 87, 102 S.Ct. at 2880.

The instant case is one of many that followed in the wake of *Northern Pipeline.* The problem here arose because of the Supreme Court's decision to stay the judgment in *Northern Pipeline* for approximately three months, *i.e.*, until October 4, 1982. *See id.* at 88, 102 S.Ct. at 2880. The Court's stay was in response to the practical problems that flowed from the invalidation of the 1978 Act. As Justice Brennan explained, "[t]his limited stay will afford Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without im-

---

1. *See In re Benny*, 44 B.R. 581 (N.D.Cal.1984), *dismissed in part, aff'd in part*, 791 F.2d 712 (9th Cir.1986), *appeal after remand*, 812 F.2d 1133 (9th Cir.1987); *In re Production Steel, Inc.*, 48 B.R. 841 (M.D.Tenn.1985); *In re Moens*, Civ. No. 84–4109 (C.D.Ill. Feb. 21, 1985), *vacated in part*, 800 F.2d 173 (7th Cir.1986); *In re Moody*, 46 B.R. 231 (M.D.N.C.1985); *In re Tom Carter Enterprises, Inc.*, 44 B.R. 605 (C.D.Cal.1984); *In re Koerner*, 800 F.2d 1358 (5th Cir.1986).

pairing the interim administration of the bankruptcy laws." *Id.* Unfortunately, Congress failed to draft new legislation by the fourth of October, 1982. The Supreme Court responded by entering a further stay of its judgment, until December 24, 1982. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 459 U.S. 813, 103 S.Ct. 200, 74 L.Ed.2d 160 (1982) (mem.). Nonetheless, that date passed as well without the enactment of any new bankruptcy legislation.

In order to deal with the continuing influx of cases, the district courts promulgated temporary emergency rules ("temporary rules") based on model rules recommended by the Judicial Conference of the United States and the Circuit Judicial Councils, which essentially reinstated the bankruptcy scheme that existed prior to the 1978 Act. *See, Benny,* 44 B.R. at 585 n. 1.[2] The transition provisions of the 1978 Act operated as continuing authority for the bankruptcy courts under the temporary rules.

The underlying problem persisted, however, because Congress could not agree on any new substantive bankruptcy legislation. On March 31, 1984, Congress extended the transition period through April 30, 1984. *See* Pub.L. No. 98–249, 98 Stat. 116 (March 31, 1984). Congress failed to meet this deadline, though, and the next and the next; on each occasion, additional extensions were tacked onto the transition period. *See* Pub.L. No. 98–271, 98 Stat. 163 (April 30, 1984); Pub.L. No. 98–299, 98 Stat. 214 (May 25, 1984); Pub.L. No. 98–325, 98 Stat. 268 (June 20, 1984). The last of these extensions expired on June 27, 1984, by which time Congress anticipated completion of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "Bankruptcy Act"). *See* 130 CONG.REC. 17,-228 (1984). Yet, like the others, Congress missed this deadline as well and it was not until July 10, 1984, that the Bankruptcy Act finally became law. Pub.L. No. 98–353, 98 Stat. 333 (July 10, 1984). In order to account for the period between the expi-

ration of the final statutory extension and the enactment of the new law, Congress included a provision in the Bankruptcy Act, section 121(e), that bankruptcy judges who were holding office on June 27, 1984 would continue in that capacity until "the end of the day of enactment of this Act." 98 Stat. 346. It is this provision that prompted the dispute giving rise to the instant litigation.

### B. *Procedural History*

The day after President Reagan signed the Bankruptcy Act, the Director issued a memorandum in which he indicated that he intended to withhold the salaries of sitting bankruptcy judges because he doubted the constitutionality of the new law. *See* Memorandum of William E. Foley, Director of the Administrative Office of the United States Courts, to Judges of the United States Courts of Appeals, Judges of the United States District Courts, and Former Bankruptcy Judges (July 11, 1984) [*hereinafter* "July 11 Memorandum"], *reprinted in* Joint Appendix ("J.A.") at Tab C. The Director stated that the lack of bankruptcy courts after June 27, 1984 precluded the existence of bankruptcy judges, regardless of any holdover provisions. Thus, under the Director's view, the Bankruptcy Act violated the Appointments Clause of the Constitution because it purported to reappoint the newly divested bankruptcy judges. *See* U.S. CONST. art. II, § 2; *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (holding unconstitutional congressional appointment of members of the Federal Election Commission). Citing his responsibility as "paymaster" of the federal judiciary and noting the adverse consequences that would follow from a judicial determination that the Bankruptcy Act was invalid, the Director decided to withhold the salaries of sitting bankruptcy judges. *See* July 11 Memorandum.

On July 14, 1984, the National Conference of Bankruptcy Judges wrote the Director, outlining arguments in support of

---

**2.** Several courts of appeals held that the *Northern Pipeline* decision did not disturb the bankruptcy jurisdiction of the federal district courts. *See, e.g., In re Kaiser,* 722 F.2d 1574, 1577–78 (2d Cir.1983); *In re Hansen* 702 F.2d 728, 729 (8th Cir.), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983).

the constitutionality of the judges' commissions and requesting a response by July 20, 1984. *See* Letter from Joe Lee, Secretary of the National Conference of Bankruptcy Judges, to William E. Foley (July 14, 1984) [*hereinafter* "National Conference Letter"], *reprinted in* J.A. at Tab D. Before any response was forthcoming, the Six Judges brought their suit in the District Court seeking declaratory and injunctive relief. *See Lundin v. Foley*, No. 84–2237 (D.D.C. July 20, 1984). That same afternoon, the Director issued a second memorandum in which he rescinded his decision to withhold the salaries of federal bankruptcy judges. Memorandum from William Foley to All Judges of the United States (July 20, 1984) [*hereinafter* "July 20 Memorandum"], *reprinted in* J.A. at Tab E. On August 29, 1984, the Director moved for summary judgment on the ground that no actual case or controversy existed or, in the alternative, that the action was moot because of the Director's decision to rescind the July 11 Memorandum. *Lundin v. Mecham*, No. 84–2237, mem. op. at 4, 1991 WL 165684 (D.D.C. Aug. 8, 1991).

■ While all of this was transpiring in the District Court below, a bankrupt debtor in California challenged the authority of the bankruptcy judge to whom her case had been referred on essentially the same constitutional grounds raised by the Director. *See Benny*, 44 B.R. at 584.[3] Both the Department of Justice[4] and the Six Judges sought to intervene in *Benny*. And because the parties here thought that "subsequent developments in *Benny* [might] affect litigation of" the suit below, the Di-

rector and the Six Judges filed a joint motion to stay the proceedings in the District of Columbia. *Lundin v. Foley*, No. 84–2237 (D.D.C. Sept. 14, 1984) (joint motion for stay). The stay was granted and the litigants focused their attention on the west coast where the *Benny* litigation was proceeding.

On September 7, 1984, the Department of Justice was allowed to intervene in *Benny*, and it subsequently filed a brief in support of Ms. Benny's attack on the constitutionality of the Bankruptcy Act. *See In re Benny*, 812 F.2d 1133, 1135 (9th Cir.1987). Also intervening, but in support of the Bankruptcy Act, was the United States Senate and the Speaker and Bipartisan Leadership Group of the House of Representatives. *Id.* The Six Judges' petition to intervene was denied, but they were granted *amicus curiae* status.[5] *Id.* at 1135 n. 1. The Six Judges subsequently filed an *amicus* brief in support of the legislation. Ultimately, the Ninth Circuit upheld in full the constitutionality of the Bankruptcy Act. *See In re Benny*, 44 B.R. 581, 598 (N.D.Cal.1984), *dismissed in part, aff'd in part*, 791 F.2d 712 (9th Cir.1986), *appeal after remand*, 812 F.2d 1133, 1142 (9th Cir.1987).

As it developed, the debtor in *Benny* was not the only one to challenge the constitutionality of the Bankruptcy Act. Thus, the stay entered by the District Court below remained in effect over four years while the issues raised by the Six Judges were adjudicated in a series of other cases in other circuits. In each case, the Depart-

---

**3.** The District Court for the Northern District of California granted Ms. Benny's motion to withdraw the reference in part so that the challenge to the bankruptcy judge's authority could be heard in an Article III court. *Benny*, 44 B.R. at 583.

**4.** Apparently, the Director did not directly appear in any of the related cases. However, nothing in our opinion turns upon the distinction between the Director and the Department of Justice. Under EAJA, the salient inquiry is whether the party seeking fees prevailed against the "United States" in a case in which the position of the "United States" was not substantially justified. Thus, we must measure the Govern-

ment's conduct as an aggregation of both the Director's prelitigation conduct and the Department of Justice's subsequent litigation position. *See Commissioner, I.N.S. v. Jean*, 496 U.S. 154, 159, 110 S.Ct. 2316, 2319, 110 L.Ed.2d 134 (1990) (position of the United States encompasses "both the agency's prelitigation conduct and the Department of Justice's subsequent litigation positions").

**5.** The denial of intervention was affirmed by the Ninth Circuit, which noted that the Six Judges would not be bound in their litigation in the District of Columbia by the outcome of the *Benny* litigation; in addition, the court noted that the Six Judges' interests were well represented in *Benny* by the existing parties to that

ment of Justice sought to intervene to attack the validity of the bankruptcy judges' appointments. The Six Judges shadowed the Department, moving to intervene wherever and whenever the Department did. Thus, it happened that, in each of the related cases, both the Department of Justice and the Six Judges appeared as either intervenors or *amici.* The Department of Justice's efforts proved fruitless though, for, as in *Benny,* the bankruptcy judges' appointments were upheld in every case in which a determination was reached on the issue. Finally, on November 29, 1988, the Director was constrained to concede defeat, and the District Court disposed of the instant case by entering an order dismissing it as moot. *Lundin v. Mecham,* No. 84–2237 (D.D.C. Nov. 29, 1988) (order dismissing case). Thereupon, the Six Judges filed the present action under EAJA [6] for attorney's fees incurred both in the District Court below and as intervenors and *amici* in the related cases. The District Court denied the motion, holding that the Director's position was substantially justified and that the Six Judges were not prevailing parties entitled to compensation under EAJA. *Lundin v. Mecham,* mem. op. at 6–10. Additionally, the District Court concluded that the Six Judges were not entitled to recover for fees incurred in the related cases. *Id.* at 11. This appeal ensued.

suit. *In re Benny,* 791 F.2d 712, 721 (9th Cir. 1986).

**6.** The Equal Access to Justice Act reads in pertinent part:

(1)(A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

(2) For the purposes of this subsection—

(C) "United States" includes any agency and any official of the United States acting in his or her official capacity;

(D) "position of the United States" means, in addition to the position taken by the United

## II. THE MERITS

### A. *The Cause of Action*

■ EAJA allows private litigants to recover attorney's fees incurred in litigation against the Federal Government if the position of the *United States* is not substantially justified. EAJA defines "United States" as "any agency and any official of the United States acting in his or her official capacity." 28 U.S.C. § 2412(d)(2)(C) (1988). As a threshold matter, the Director asserts that the Six Judges have no cause of action under EAJA since the use of the term "United States" in the statute does not encompass officers associated with the judicial branch of government.[7] We reject this assertion because, whether or not the Administrative Office is an "agency" for the purposes of EAJA, we have no doubt that the Director is an "official of the United States."

■ For one thing, we can find no basis whatsoever in the language of EAJA to support the Director's claim that Government officials working in the judicial branch should be excluded from the statute's reach. Further, it cannot be disputed that, under the literal terms of the statute, the Director is an "official of the United States."[8] Nor can it be doubted that the position is not expressly excluded from EAJA's fee provisions. And, even assuming that we had the authority to carve out

States in the civil action, the action or failure to act by the agency upon which the civil action is based;

(4) Fees and other expenses awarded under this subsection to a party shall be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise. 28 U.S.C. § 2412(d) (1988).

**7.** The Director is appointed and is removable by the Chief Justice, after consultation with the Judicial Conference. He operates at the direction of the Judicial Conference, which is composed entirely of Article III judges. 28 U.S.C. §§ 331, 601, 604(a) (1988).

**8.** Different considerations might come into play with respect to the question whether Article III judges are also "officials" under the Act. *Cf. In re Perry,* 882 F.2d 534, 539 (1st Cir.1989) (EAJA should not apply to "pure adjudicators"). But we need not face that issue here.

such an exclusion, there is no good reason to do so. The legislative history of EAJA makes it evident that the statute was intended as a shield for the individual to use against the overwhelming resources of the Federal Government. *See, e.g.,* 126 CONG. REC. 27681 (2d Sess.1980) (statement of Senator DeConcini) (EAJA applies to "civil actions brought by or against the Federal Government"); *id.* at 28845 (statement of Senator Domenici) (EAJA applies when a citizen must litigate against the "Federal Government and its agencies"); *id.* at 28646 (statement of Congresswoman Fenwick) (EAJA provides protection against "big Government"). In the typical run of cases, EAJA will most often be used to recover fees from executive agencies. Nonetheless, the coercive power of the Federal Government is not limited to any one branch. To best effectuate congressional intent, EAJA must apply wherever those resources are brought to bear against individual citizens. *See Armster v. United States District Court,* 817 F.2d 480, 484 n. 4 (9th Cir.1987) (implying, but not directly holding, that EAJA applies to both officials in the judicial branch and to judicial officers); *cf. League of Women Voters v. FCC,* 798 F.2d 1255, 1259 (9th Cir.1986) (EAJA not limited to executive action). And even if we were to embrace the First Circuit's exception for pure "adjudicators," *see* note 8 *supra,* the Director would not qualify since his duties are administrative rather than adjudicative. Thus, we have no difficulty in concluding that the Director of the Administrative Office of the United States Courts is an "Official of the United States" within the meaning of EAJA.[9]

B. *The Six Judges are Entitled to Recover Attorney's Fees Incurred in the District Court Litigation Below*

1. *Prevailing Party*

▮ In order to qualify for relief under EAJA, one must be the "prevailing

party" in an action by or against the United States. The question whether the Six Judges prevailed in this case is complicated somewhat by the fact that the District Court did not award any relief. Rather, the District Court simply granted the Director's motion to dismiss the case as moot. Although there may be some intuitive appeal in categorizing this dismissal as a victory for the Director, it is well accepted that such a dismissal is not the equivalent of a conclusion that the Director prevailed. *See Public Citizen Health Research Group v. Young,* 909 F.2d 546, 549 (D.C.Cir.1990) (one need not obtain judicial relief to be the prevailing party); *Jones v. Lujan,* 883 F.2d 1031, 1033 (D.C.Cir.1989) (dismissal as moot did not preclude award of attorneys fees). To determine whether a party has prevailed in a case in which judicial relief was not awarded, we have applied a two-part test that asks: (1) whether the party received a significant part of the relief it sought; and (2) whether the lawsuit was a necessary or substantial factor in obtaining the result. *Tucson Medical Center v. Sullivan,* 947 F.2d 971, 982 (D.C.Cir.1991); *Commissioners Court of Medina County v. United States,* 683 F.2d 435, 440 (D.C.Cir.1982); *cf. Texas State Teachers Ass'n. v. Garland Indep. School Dist.,* 489 U.S. 782, 791, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989) (prevailing party under 42 U.S.C. § 1988 is one that succeeds on any significant claim).[10]

On the facts before us, there is no doubt that the Six Judges received a significant part of the relief they sought in the suit below. They continued to serve as bankruptcy judges with no break in service; the Director agreed to pay their salaries; and their pensions and other benefits remained secure. The application of the second prong of the test is somewhat more debatable, however. It is not good enough that

---

**9.** This conclusion disposes of the Director's claim that the District Court lacked subject matter jurisdiction because sovereign immunity had not been waived. Since the Director is encompassed within the group of officials covered by EAJA, the specific waiver of sovereign immunity contained in the statute extends to this suit.

**10.** The standards for fee recovery under section 1988 are generally applicable to all statutes that authorize fee awards to prevailing parties. *Hensely v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983).

the Six Judges obtained the relief sought; they must also satisfy the court that there is a causal relationship between the litigation and the result. To make this determination, the District Court should have asked whether, but for their litigation efforts, the Six Judges would have received the relief desired. *Public Citizen*, 909 F.2d at 550.

In this case, the District Court concluded that the causation prong of the test had not been satisfied. In reaching its decision, the District Court wrote:

> Nothing in the record supports an argument that the Director issued his memorandum of July 20, 1984 because the plaintiffs filed this action. Moreover, in response to the complaint, the Director filed a motion to dismiss or in the alternative for summary judgment. Thereafter the parties agreed to a stay of this action and nothing else was done except for this court's dismissal of the action as being moot.

*Lundin v. Mecham*, mem. op. at 10. The District Court apparently understood the Director's motion to dismiss the case as moot, filed on August 29, 1984, to be based on the July 20 Memorandum. Thus, when the District Court granted the motion to dismiss over four years later, on November 29, 1988, it viewed its action as, in substance, agreeing that the case had been moot four years earlier. Since the Six Judges' subsequent efforts in court logically could have no bearing on the Director's July 20 Memorandum, the District Court concluded that the Six Judges had not caused the result obtained and therefore were not the prevailing party. In reviewing determinations such as this, we customarily accord the District Court's decision deference. *See Public Citizen*, 909 F.2d at 550. Yet, in this case, the District Court's erroneous failure to consider the Six Judges' litigation efforts in the related cases satisfies us that the District Court's holding on this aspect of the case must be reversed.

As we see it, the substance of the District Court's Order dismissing the case in November, 1988 was not a recognition that the case had been moot for the preceding four years, but an acknowledgement that the Director realized his position to be untenable. Indeed, the alleged mootness of the case is belied by the fact that the Director joined the Six Judges in a motion to stay the proceedings in this case pending the outcome of the *Benny* litigation in the Ninth Circuit. It is also belied by the fact that the Government continued to attack the constitutionality of the bankruptcy judges' appointments in *Benny* and in the related cases.

If the Government were satisfied that there was no infirmity in the judges' appointments, it would have been incongruous for it to have intervened in the related cases. The lesson, in fact, from the Government's continued efforts to litigate these issues is that the Six Judges *were not* safe in relying upon the Director's July 20 Memorandum. If the Department of Justice had again pressed the issue, the Director might have again succumbed and withheld the judges' salaries. And if the Department of Justice had prevailed in any of the related cases, the Director likely would have newly revoked the Six Judges' salaries. Thus, there is no basis for a finding that the Director's motion to dismiss signaled the beginning of the end of the dispute. Rather, until the constitutionality of the Bankruptcy Act and the validity of the bankruptcy judges' appointments had been firmly established, the Director's July 20 Memorandum was impotent to resolve the controversy between the parties. As we understand the character of the proceedings below, the District Court stayed the suit and delayed ruling on the Director's motion to dismiss precisely *because* legal issues critical to the case remained to be resolved—either in the District of Columbia or elsewhere. It was reversible error, therefore, for the District Court to exclude the litigation of the related cases from consideration in deciding whether the Six Judges' prevailed below.[11]

---

11. We recognize that the District Court did not completely overlook the relationship between the related cases and the present case. In its order dismissing the present case, the District

■ Given, then, that the related cases must be factored into the causation calculus, we are convinced that the Director's ultimate capitulation was fundamentally a product of those cases in which the Six Judges' position was uniformly vindicated. Once the issues had been resolved in the related cases, it became impossible for the Director to believe that he might successfully defend against the Six Judges' action in the District of Columbia, and he readily agreed to the dismissal of the case. The dismissal, though putatively based on mootness due to the Director's July 20 Memorandum, was in actuality founded upon the efforts of the Six Judges, both in prosecuting the suit below and in assisting in the defense of the Bankruptcy Act in the related cases. Hence, we are satisfied that the Six Judges were the prevailing party in the suit below.

### 2. The Director's Position was not Substantially Justified

■ Under EAJA, we may only award attorney's fees if the Government's position was not substantially justified. 28 U.S.C. § 2412(d)(1)(A) (1988). The "substantial justification" test applies to both the Government action that gave rise to the litigation and to the Government's conduct of the litigation. 28 U.S.C. § 2412(d)(2)(D) (1988); *see also Trahan v. Brady*, 907 F.2d 1215, 1218 (D.C.Cir.1990). Thus, in this case, both the Director's decision to with-

hold the Six Judges' salaries and the Department of Justice's conduct of the litigation must be evaluated. Moreover, the Government bears the burden of establishing that its position was substantially justified. *Jones v. Lujan*, 887 F.2d 1096, 1098 (D.C.Cir.1989). In order to carry this burden, the Government must show that its position was "justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988); *accord Trahan*, 907 F.2d at 1218. The District Court below concluded that the Director met this burden. *Lundin v. Mecham*, mem. op. at 9. Although we review this conclusion using the "abuse of discretion" standard, *see Pierce*, 487 U.S. at 562–63, 108 S.Ct. at 2548–49, we nonetheless hold that the court erred with regard to the reasonableness of the Director's position.

■ We begin by noting that the District Court was correct with regard to the first half of the analysis—whether the Director's issuance of the July 11 Memorandum was substantially justified.[12] Because of concern over the constitutionality of section 121(e), the status of bankruptcy judges was in question from the moment the President signed the new Bankruptcy Act into law.[13] In the July 11 Memorandum, the Director outlined the concerns expressed by the President and those of his own General Counsel, and briefly discussed the relevant Supreme Court case.[14] In addi-

Court stated: "The motion [to dismiss] was held in abeyance pending disposition in a related matter. The Court is now advised that this case is moot although plaintiffs may seek to move for attorneys fees." *Lundin v. Mecham*, No. 84–2237 (D.D.C. Nov. 29, 1988) (order dismissing case). And in the background section of the Memorandum decision denying fees, the District Court noted: "no further action was taken in this court until the Court noted that it appeared that this action was moot in view of pending litigation in other courts." *Lundin v. Mecham*, No. 84–2237, mem. op. at 4–5, 1991 WL 165684 (D.D.C. Aug. 8, 1991). However, in deciding that "[t]he plaintiffs did not prevail in the underlying litigation," the District Court did not factor in the litigation of the related cases. *See id.* at 10.

**12.** Naturally, the fact that the Government lost on the merits in the related cases is not alone enough to show that its position was unreason-

able. *See Pierce*, 487 U.S. at 569, 108 S.Ct. at 2552; *Trahan*, 907 F.2d at 1218.

**13.** President Reagan had been advised by the Department of Justice that section 121(e) of the Act violated the Appointments Clause of the Constitution. 20 Weekly Comp.Pres.Doc. 1011 (July 10, 1984). The President signed the bill only because he believed there were mechanisms to circumvent the allegedly invalid provisions. *Id.*

**14.** The Director wrote, in pertinent part:

If the purpose served by [section 121 of the Act] is interpreted to be equivalent to a new appointment of individuals to offices they held on June 27, there is a very real possibility, in light of the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1 [96 S.Ct. 612, 46 L.Ed.2d 659] (1976), that the section will be held to be unconstitutional when challenged.

tion, the Director explained that he intended to withhold all bankruptcy judges' salaries in order to protect the public fisc. Given the unsettled state of the law at that time, the Director's initial position cannot be deemed unreasonable.

■■■■ The Director's position in the litigation, however, is another matter. Even assuming that the Director had reasonable grounds to question the constitutional validity of section 121(e) when he issued the July 11 Memorandum, neither the Director nor the Department of Justice ever satisfactorily addressed the Six Judges' *statutory argument*, which circumvented the constitutional question entirely. The Six Judges argued that the 1978 Act contained specific holdover provisions in sections 404(b) and (d) that extended the tenure of bankruptcy judges until the appointment of their successors, thus obviating reliance upon the "retroactive" appointment contained in section 121(e) of the Bankruptcy Act (of 1984). Under this scheme, the bankruptcy judges never ceased to hold office and were therefore incapable of being unconstitutionally reappointed.

The Director was first alerted to this statutory argument in the National Conference Letter.[15] Since statutes should be construed to avoid constitutional infirmities, *see New York Transit Auth. v. Beazer*, 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979), this argument *should* have been given serious consideration by the Government. Yet, following the Six Judges' complaint in the suit below, the Director filed a motion to dismiss the case as moot based on the July 20 Memorandum without mentioning the compelling statutory reasons that might have actually disposed of the suit. As discussed above, there is no basis to find that the case was moot in August of 1984. Hence, in considering the substantiality of the Government's position, we must consider its conduct in the related cases, in which the real issues relevant to the controversy remained to be decided. Over the course of the next four years, as the Six Judges assisted in the litigation of the related cases, they raised their statutory argument time and time again. Yet, the Government largely discounted these arguments,[16] relying in-

---

In that event decisions by bankruptcy judges relying upon section 121 for their grants of judicial authority may be invalidated, extensively disrupting the bankruptcy system and inconveniencing bankruptcy litigants.

**15.** The portion of the Letter highlighting this argument read:

You and your General Counsel appear to be acting on the erroneous assumption that the terms of all sitting bankruptcy judges expired on June 27, 1984. By the plain language of section 404(b) of the Bankruptcy Reform Act the term of any bankruptcy judge who was holding office on the date of enactment of that act, and who was still in office on June 27, 1984, is extended until "his successor takes office."

In the attached memorandum I have traced the legislative history and the purpose and meaning of the provision in section 404(b) of the Bankruptcy Reform Act that operated to continue in office after June 27, 1984 those incumbent bankruptcy judges who also were in office on November 6, 1978, the date of enactment of the Bankruptcy Reform Act of 1978. We estimate that more than half the sitting bankruptcy judges are in this category. Consequently, there is no *Buckley v. Valeo* problem with respect to such judges. The simple fact is the terms of those judges had not expired prior to July 10, 1984, the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984.

Those bankruptcy judges appointed after November 6, 1978, during the transition period, were evaluated by a merit screening committee organized by the Circuit Executive and were found to be qualified by the Chief Judge of the circuit after consultation with such committee. Bankruptcy Reform Act of 1978, §§ 404(b), (c), and (d). The action of Congress in extending the terms of these individuals, many of whom have been in office for only a short period of time, is a perfectly logical and reasonable gesture that probably would be viewed by most courts as merely the "confirmation" of appointments recently and properly made by courts of law rather than as an attempt by Congress to make an appointment. We do not consider the opinion in *Buckley v. Valeo* apposite to the present factual situation.

**16.** It would be inaccurate to say the Government never addressed the statutory arguments raised by the Six Judges. *See Benny*, 44 B.R. at 587 n. 8. However, the extent of the Government's response was to ask the court to "disregard the express amendments to 404(b) in Section 1(b) of the extension statute and consider only the extension of term of office contained in Section 2." *Id.* Section 1 of each of the extension statutes amended section 404 of the 1978 Act by deleting the expiration date of the transition period and the specified date for the expiration of the judges' terms of office. Section 2 of

stead upon its view that the Bankruptcy Act violated the Appointments Clause of the Constitution. In the end, though, it was exactly this statutory argument that proved most persuasive in the merits litigation. *See, e.g., Benny,* 812 F.2d at 1141; *Production Steel, Inc.,* 48 B.R. at 848. Thus, the position taken by the United States was flawed from the outset—undermined by a statute that avoided the constitutional issue entirely. Nonetheless, the Government continued to litigate, though it had no reasonable basis to question the Six Judges' statutory argument. We therefore conclude that the Government was not substantially justified in its conduct of the litigation.

In conclusion, the District Court committed reversible error in holding that the Six Judges were not prevailing parties and that the Government's position was substantially justified. Under EAJA, the statutory elements have been satisfied and the Six Judges are entitled to recover attorney's fees incurred while prosecuting this case in the District of Columbia.

### C. The Six Judges Cannot Recover for Fees Incurred in the "Related Cases"

Naturally, a great portion of the fees incurred by the Six Judges resulted from their efforts as intervenors and *amici* in the related cases. Perhaps in an effort to recover for all of their expenses at once, or perhaps sensing that recovery would be denied if sought elsewhere, the Six Judges applied to the District Court to recover all of their attorneys fees, both incurred below and in the related cases. Relying on the Supreme Court's decision in *North Carolina Department of Transportation v. Crest Street Community Council, Inc.,* 479 U.S. 6, 107 S.Ct. 336, 93 L.Ed.2d 188 (1986), the District Court concluded that it was powerless to award attorney's fees for work performed in the related cases. Because we agree that this case does not warrant a departure from the general rule that a court may not award fees under EAJA for work performed in other jurisdic-

tions, we affirm this portion of the District Court's opinion.

As an initial matter, we note that EAJA apparently limits recovery to *parties;* thus, the Six Judges' claim may be statutorily barred, at least to the extent that they seek to recover for fees incurred in cases in which they appeared as *amici. See* 28 U.S.C. § 2412(a) (1988) (relief may be awarded to a prevailing "party"); *cf. A. Hirsh, Inc. v. United States,* 948 F.2d 1240, 1250–51 (Fed.Cir.1991) (an *amicus curiae* is a volunteer who cannot be said to have incurred litigation expenses as a result of another's conduct). The natural reading of the statute is that only "parties," as the term is used in its technical legal sense, may recover fees under the statute. However, the specific statutory section defining "party" makes no mention of any such limitation and at least one court has come to the contrary conclusion. *See* 28 U.S.C. § 2412(d)(2)(B) (1988); *Coleman v. Block,* 589 F.Supp. 1411, 1419 (D.N.D.1984) (recovery for fees of *amicus* that was "crucial" to plaintiff's case).

We need not decide the meaning of the term "party" as it is used in EAJA in order to resolve the issue before us. Even assuming, *arguendo,* that the statute allows courts to award fees to participants in litigation who appear as *amici,* the statute expressly forbids the award of fees in actions over which the court lacks jurisdiction. 28 U.S.C. § 2412(d)(1)(A) (1988); *see also Smith v. Brady,* 972 F.2d 1095, 1097 (9th Cir.1992); *Francis E. Heydt Co. v. United States,* 948 F.2d 672, 677 (10th Cir. 1991). *But cf. National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1335 (D.C.Cir.1982) ("[c]ompensable time should not be limited to hours expended within the four corners of the litigation" in calculating fee award under FOIA). Thus, the proper place to bring a claim for fees under EAJA is in the circuit in which the work was done.

The Six Judges object to the application of this rule on the facts of the present case. In the Six Judges' view, the

each of the extension statutes extended the judges' terms of office to a new specified date.

In our view, the Government's approach was unfounded and wholly insubstantial.

related cases were part and parcel of the case below so that the whole volume of litigation comprised a single litigation unit. The Six Judges analogize this case to those in which recovery has been allowed for fees incurred in *agency* proceedings related to a suit in federal court. *See, e.g., Sullivan v. Hudson*, 490 U.S. 877, 892, 109 S.Ct. 2248, 2257, 104 L.Ed.2d 941 (1989) ("administrative proceedings may be so intimately connected with judicial proceedings as to be considered part of the 'civil action' for purposes of a fee award"); *North Carolina DOT*, 479 U.S. at 15, 107 S.Ct. at 341 (fees incurred in administrative proceedings "necessary" to the prosecution of civil rights claims are recoverable under 42 U.S.C. § 1988); *Full Gospel Portland Church v. Thornburgh*, 927 F.2d 628, 631 (D.C.Cir.1991) (fees incurred in administrative action recoverable where continuing court jurisdiction over the post-remand agency proceedings is essential), *cert. denied*, — U.S. —, 112 S.Ct. 867, 116 L.Ed.2d 773 (1992). Thus, the Six Judges argue that, since the related cases were necessary to prevail in the litigation below, the costs incurred in those suits ought to be recoverable from this court.

, We are not persuaded. The relationship between a federal court and an agency in which procedural/remedial steps take place is fundamentally different than the relationship between two Article III courts treating identical issues in different circuits. The nature of Article III review of administrative procedures requires a high degree of dependence and integration. In essence, the administrative agency performs procedural steps that would otherwise occur in the federal court. Conversely, agencies are dependent upon federal courts for the various Article III powers retained by the court. This symbiotic relationship cannot exist between two federal courts, since they share coextensive constitutional powers.

Indeed, it is precisely the interrelatedness of the court/agency relationship that undercuts the Six Judges' argument. As

long as the federal court has *jurisdiction* over the action, no statutory bar appears to the award of fees for *any part* of the action. *See Melkonyan v. Sullivan*, — U.S. —, —, 111 S.Ct. 2157, 2162, 115 L.Ed.2d 78 (1991) (*Sullivan* "stands for the proposition that in those cases where the district court retains jurisdiction of the civil action and contemplates entering a final judgment following the completion of administrative proceedings, a claimant may collect EAJA fees for work done at the administrative level."). Thus, the *Sullivan* analysis is inapposite where the District Court does not have continuing jurisdiction over the related proceedings.

■ We are similarly unpersuaded by the Six Judges' reference to *Bartholomew v. Watson*, 665 F.2d 910 (9th Cir.1982). In *Bartholomew*, the Ninth Circuit held that fees incurred in a state court proceeding following the federal court's *Pullman* abstention[17] were recoverable under 42 U.S.C. § 1988. *See id.* at 914. However, as in the agency cases described above, the proceedings in the state court in *Bartholomew* were "an essential step" in the federal suit. *Id.; see also Lampher v. Zagel*, 755 F.2d 99, 103–04 (7th Cir.1985) (fee award appropriate where state court proceedings are a "necessary part" of federal suit). And, as in the agency cases, the federal court does not sacrifice *jurisdiction* merely because it has abstained so that a state court might clarify an antecedent state law question. *See England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Thus, again, no friction with the statutory limitation arises. In both the *Sullivan* and *Bartholomew* lines of cases, a federal court defers to another tribunal so that essential procedural or jurisprudential steps may be completed. Since the *action* is never out of the federal court's purview, there is no impropriety in awarding recovery for the fees associated with those steps.

---

**17.** *See Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

In the present case, however, the District Court for the District of Columbia did not have jurisdiction over the related cases; those cases were neither an essential step in connection with, nor in any way controlling in the prosecution of, the suit below. This court cannot, therefore, award recovery under EAJA for fees incurred in the related cases.[18] Although we agree that the cases were related to the present case in terms of the legal issues presented, that is not equivalent to holding that they were necessary to the vindication of the Six Judges' claims.[19] *Cf. Rock Creek Ltd. v. State Water Res. Control Bd.*, 972 F.2d 274, 278–79 (9th Cir.1992) (no EAJA recovery for fees incurred in related administrative proceeding that was neither a condition precedent for entry into federal court nor a part of a continuing federal court action).

### III. CONCLUSION

In sum, we hold that the Six Judges prevailed in their suit below and that the position of the United States was not substantially justified. Thus, the Six Judges are entitled to recover for the attorney's fees they incurred in prosecuting their case here in the District of Columbia. However, we affirm the District Court's denial of recovery for fees incurred in the related cases. Hence, we affirm in part, reverse in part, and remand to the District Court for determination of the costs and fees due.

*So Ordered.*

---

18. We also note that the courts in which the related cases were litigated, unlike the state court in *Bartholomew,* are themselves empowered to award fees under EAJA. Thus, there is no apparent reason for the Six Judges *not* to have applied to those courts.

19. We recognize that the litigation in the related cases had a direct impact on the result below, because the Government's losses in the related cases forced it to concede here. This, however, is not the same as finding that the related cases were *essential* to the disposition of the instant case.