4 F.3d 1556
 Fed. Sec. L. Rep. P 97,764, Bankr. L. Rep. P 75,448
In re INVESTMENT BANKERS, INC., Debtor.
James H. TURNER, Trustee, Plaintiff-Appellee,
v.
DAVIS, GILLENWATER & LYNCH; Gilbert K. Davis, individually
and as a partner of Davis, Gillenwater & Lynch, a
partnership, Defendants-Appellants,
and
O'Connor & Hannan, a partnership, Defendant.
Securities Investor Protection Corporation, Appellee.
 No. 92-1121.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 17, 1993.
 
 Maria J. Flora and Adrienne H. Benavidez, Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, CO (on the brief), for appellee James H. Turner, Trustee.
 Josephine Wang, Associate Gen. Counsel, Securities Investor Protection Corp., Washington, DC (Theodore H. Focht, Gen. Counsel, and Michael E. Don, Deputy Gen. Counsel, with him, on the brief) for appellee Securities Investor Protection Corp.
 Robert T. Copeland of Copeland, Molinary & Bieger, Abingdon, VA (George H. Vaught, Denver, CO, and Gilbert K. Davis, pro se, Vienna, VA, with him, on the brief) for defendants/appellants.
 Before BRORBY, Circuit Judge; BARRETT, Senior Circuit Judge, and EBEL, Circuit Judge.
 EBEL, Circuit Judge.
 
 
 1
 The appellee/trustee, James H. Turner, was appointed as the trustee for the debtor, Investment Bankers, Inc. ("IBI"), pursuant to a liquidation proceeding commenced under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. Sec. 78aaa et seq. The trustee subsequently commenced this action in the bankruptcy court against the defendants/appellants, Davis, Gillenwater & Lynch and Gilbert K. Davis, to recover payments of $11,858 and $25,000 that IBI made to the appellants immediately prior to the commencement of the liquidation proceeding. We conclude that the bankruptcy court and the bankruptcy judge of that court had jurisdiction over the trustee's suit, and we affirm the ruling that the payments to the appellants were invalid as preferential and fraudulent transfers. Additionally, we affirm the ruling that the trustee was entitled to pretrial interest.
 
 FACTS
 
 2
 Prior to the SIPA liquidation proceedings, IBI was a securities broker-dealer incorporated in the State of Colorado. On May 8, 1981, IBI became the principal underwriter of 20 million shares of Chipola Oil Corporation ("Chipola") common stock. As a result of a sudden surge in the price of Chipola stock, the Securities and Exchange Commission ("SEC") began to investigate the existence of a stock manipulation scheme, and suspended trading in Chipola stock on July 2, 1981. This suspension caused a devaluation of the shares of Chipola stock still possessed by IBI, and prompted an inquiry from the SEC about IBI's continued compliance with the SEC's net capital requirements. IBI immediately sent a telegram to the SEC stating that it was ceasing its business operations as of July 2, 1981 until its capital complied with the SEC's net capital requirements.
 
 
 3
 On July 8, 1981, IBI asked Gilbert K. Davis, a partner in the Virginia based law firm of Davis, Gillenwater & Lynch, to represent it and two of its directors, Richard Belknap and William Chandler, in connection with the SEC's stock manipulation investigation and its suspension of trading in Chipola stock. Davis agreed to fly to Colorado to consult with IBI and its directors in exchange for a fee of $10,000. Davis spent two days consulting in Colorado, during which time IBI agreed to give Davis a $25,000 retainer for additional work to be performed by Davis.
 
 
 4
 On July 10, 1981, the SEC filed suit against IBI, Belknap, and Chandler, seeking to enjoin them from engaging in further securities transactions while IBI was in violation of the SEC's net capital requirements. The same day, the Securities Investment Protection Corporation ("SIPC") filed suit against IBI under the SIPA, seeking the appointment of a trustee for the purpose of liquidating IBI. The SIPC's complaint alleged that IBI was in danger of failing to meet its obligations to its customers as a result of its violation of the SEC's net capital requirements.
 
 
 5
 Both actions were consolidated in the District Court of Colorado, and a hearing was held on July 10, 1981 at which IBI was represented by Davis. At the conclusion of this hearing, the district court entered a consent order with respect to the SEC action enjoining IBI from doing business and from disbursing funds other than for rent, utilities, and existing employee's salaries. The district court deferred action on the SIPC's request for the initiation of liquidation proceedings.
 
 
 6
 Just prior to the July 10 hearing, Davis received two checks from IBI that he immediately converted into cashiers checks. The first check, in the amount of $11,858, covered Davis' $10,000 legal fee and $1,858 in expenses for the two days he spent consulting in Colorado. The second check, in the amount of $25,000, constituted payment of the retainer that IBI had negotiated with Davis for future legal services.
 
 
 7
 On July 14, 1981, the SEC renewed its application for injunctive relief against IBI, alleging that the debtor had issued checks in violation of the July 10 consent order. The following day, the district court approved the SIPC's application for a protective decree and appointed the current trustee to oversee the liquidation of IBI. Following the appointment of the trustee, the liquidation proceeding was removed to the bankruptcy court. With the commencement of the liquidation proceedings, the SEC withdrew its renewed application for injunctive relief against IBI.
 
 
 8
 On September 1, 1981, Davis filed a written claim with the trustee against IBI's estate for a cash credit balance and some securities. The trustee issued no determination of the claim. Rather, on January 19, 1982, the trustee commenced the instant suit against Davis and Lynch in the bankruptcy court seeking the return of the $36,858 that IBI paid to Davis on July 10, 1981. The trustee claimed that the payment of $11,858 was voidable as a preference under 11 U.S.C. Sec. 547[1] and that the payment of $25,000 was voidable as a fraudulent transfer under 11 U.S.C. Sec. 548.[2] The appellants filed two counterclaims seeking reimbursement for a hotel bill in the amount of $469.95 incurred by Davis while consulting with IBI in Denver and for legal fees in the amount of $13,819.32 for services rendered to IBI, Belknap and Chandler.
 
 
 9
 The trustee's claim proceeded to trial on August 7, 1984, and concluded on July 19, 1985 after several lengthy continuances. The bankruptcy court rejected the argument that Article III prevented it from hearing actions seeking recovery of preferences and fraudulent conveyances and it also rejected the argument that the bankruptcy judge was appointed in violation of Article II. However, the bankruptcy court did conclude that it lacked statutory jurisdiction to entertain suits brought under the aegis of the SIPA. Notwithstanding its conclusion that it lacked jurisdiction, the bankruptcy court proceeded to the merits of the trustee's claim and held that the $11,858 payment to Davis constituted a preference under 11 U.S.C. Sec. 547 and the $25,000 payment to Davis constituted a fraudulent transfer under 11 U.S.C. Sec. 548.
 
 
 10
 The trustee appealed the bankruptcy court's decision to the district court. In its order of October 5, 1989, the district court reversed the bankruptcy court's determination that it lacked jurisdiction and affirmed its determination that the two payments to Davis were voidable under 11 U.S.C. Secs. 547 and 548. The trustee subsequently moved the court to amend its order for an award of prejudgment interest, and in an order dated May 15, 1990 the court referred this question to the bankruptcy court, 136 B.R. 1008. The bankruptcy court subsequently determined that the trustee was entitled to prejudgment interest, 135 B.R. 659. The appellants appealed this decision to the district court which affirmed the bankruptcy court's determination on March 31, 1992. The appellants subsequently filed the current appeal.
 
 DISCUSSION
 
 11
 The appellants present the following claims on appeal: 1) the bankruptcy court lacked jurisdiction under Article III to hear actions to recover preferences and fraudulent transfers, 2) the bankruptcy judge lacked authority to preside over the trustee's suit because he was appointed in violation of Article II, 3) the bankruptcy court lacked statutory jurisdiction to hear cases under the SIPA, 4) the bankruptcy court erred in finding that the $11,858 and $25,000 payments by IBI to the appellants were invalid as preferential and fraudulent transfers respectively under 11 U.S.C. Secs. 547 and 548, and, 5) the bankruptcy court erred in awarding prejudgment interest to the trustee.
 
 
 12
 When reviewing challenges to the decisions of the bankruptcy courts, we apply the same standard of review as the district court. Fidelity Sav. & Inv. Co. v. New Hope Baptist, 880 F.2d 1172, 1174 (10th Cir.1989). Accordingly, the bankruptcy court's findings of fact are reviewed under a clearly erroneous standard while the court's conclusions of law are subject to de novo review. Id.; Bartmann v. Maverick Tube Corp., 853 F.2d 1540, 1543 (10th Cir.1988).
 
 
 13
 I. The Jurisdiction of the Bankruptcy Court Under Article
 
 III
 
 14
 Title 15 United States Code Sec. 78fff(b) states that a liquidation proceeding under the SIPA is to be conducted "in accordance with, and as though it were being conducted under ... Title 11." Title 28 U.S.C. Sec. 157(b)(1) states that bankruptcy courts "may hear and determine ... all core proceedings arising under title 11." Section 157(b)(2) defines a core proceeding to include "proceedings to determine, avoid or recover preferences" and "proceedings to determine, avoid, or recover fraudulent conveyances." Pursuant to these provisions, the trustee brought suit against the appellants in the bankruptcy court seeking to avoid IBI's payment of attorney's fees to the appellants as preferential and fraudulent transfers. The appellants argue that the bankruptcy court lacked jurisdiction under Article III to hear the trustee's suit because the trustee's claims involved private rights that may only be adjudicated by Article III tribunals.[3]
 
 
 15
 In Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), the Supreme Court defined a balancing test for determining whether a particular jurisdictional grant to a non-Article III court was constitutional. The Court stated that the critical question is whether the jurisdictional grant "impermissibly threatens the institutional integrity of the Judicial Branch," taking into account "the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III." 478 U.S. at 851, 106 S.Ct. at 3257.
 
 
 16
 In Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 54, 109 S.Ct. 2782, 2797, 106 L.Ed.2d 26 (1989), the Court stated, "[t]he Crucial question, [determining whether Congress may commit adjudication of a statutory cause of action to a non-Article III tribunal] in cases not involving the Federal Government, is whether 'Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency regulation with limited involvement by the Article III judiciary.' " (quoting Thomas v. Union Carbide Agri. Prod. Co., 473 U.S. 568, 593-4, 105 S.Ct. 3325, 3339-40, 87 L.Ed.2d 409 (1985)).
 
 
 17
 Applying the Schor test to the instant case, we conclude that the bankruptcy court's determination of the trustee's preference and fraudulent conveyance claims did not violate Article III. First, proceedings involving preferential and fraudulent transfers are "proceeding[s] of the type traditionally adjudicated by non-article III bankruptcy courts," In re Comm. of Unsecured Creditors of F S Communications Corp., 760 F.2d 1194, 1199 (11th Cir.1985), at least where, as here, the party receiving the alleged preference or fraudulent conveyance has filed a claim against the debtor's estate. See Katchen v. Landy, 382 U.S. 323, 333-35, 86 S.Ct. 467, 475-76, 15 L.Ed.2d 391 (1966). Second, the right of a bankruptcy trustee to void preferences and fraudulent transfers is a congressionally created right pursuant to Congress' authority under Article I Section 8 of the Constitution to provide for uniform bankruptcy laws. In the Matter of Associated Grocers of Nebraska Cooperative, Inc., 62 B.R. 439, 445 (D.Neb.1986). In Northern Pipeline Const. Co. v. Marathon Pipe Line, the Supreme Court distinguished between state-created rights and rights of congressional origin, holding that Congress had much greater discretion to assign the latter to non-Article III courts. See 458 U.S. 50, 83-84, 102 S.Ct. 2858, 2877-78, 73 L.Ed.2d 598 (1982); In re Mankin, 823 F.2d 1296, 1308-09 (9th Cir.1987). Finally, since the assets of the bankruptcy estate are mustered in the bankruptcy court, a strong reason exists for enabling the bankruptcy court to preside over trustee actions designed to augment the estate. See In re Great Am. Mfg. and Sales, Inc., 129 B.R. 633, 636 (C.D.Cal.1991). Absent such authority, the bankruptcy proceedings would have to be stayed until the preference and fraudulent conveyance actions could be adjudicated in the district court, "with all the delay and expense that course would entail." Katchen, 382 U.S. at 339, 86 S.Ct. at 478.
 
 
 18
 Our conclusion that the bankruptcy court had authority over the trustee's suit is consistent with our prior decision in John E. Burns Drilling Co. v. Central Bank of Denver, 739 F.2d 1489, 1494 (10th Cir.1984), where we concluded that the bankruptcy courts had authority under Article III to hear proceedings involving preferences. Although we decided this case prior to Schor, we stressed that such proceedings were very different from the type of proceedings that Northern Pipeline held must be adjudicated by an Article III court. Id. Other courts have similarly concluded that the bankruptcy courts have authority to preside over preferential and fraudulent transfer proceedings. See, e.g., In re Mankin, 823 F.2d 1296, 1301-1310 (9th Cir.1987); In the Matter of Associated Grocers, 62 B.R. at 442-47; cf. In re Davis, 899 F.2d 1136, 1140 n. 9 (11th Cir.1990) (suggesting that the bankruptcy courts may have authority to preside over fraudulent conveyance and preference actions under Article III only where the alleged recipient of the fraudulent conveyance or preference has filed a claim against the debtor's estate). Accordingly, notwithstanding the fact that preferential and fraudulent transfer proceedings may involve private rights, we hold that the bankruptcy court had jurisdiction under Article III to adjudicate the trustee's suit.
 
 
 19
 II. The Constitutionality of the Bankruptcy Judge's
 
 Appointment
 
 20
 In 1978, Congress overhauled the bankruptcy courts by replacing the old referee system with a new Article I bankruptcy court of substantially expanded jurisdiction. The 1978 Act provided that bankruptcy judges would be appointed to 14-year terms by the nomination of the President and the consent of the Senate. The Act established a 4-and- 1/2-year transition period, to end on March 31, 1984, during which time the existing bankruptcy courts were to be continued. Section 404(b) of the 1978 Act extended the term of bankruptcy judges serving prior to the Act until the end of the transition period or when their "successors take office." Pub.L. No. 95-598, 92 Stat. 2683-84 (1978).[4]
 
 
 21
 As noted previously, the Supreme Court in Northern Pipeline struck down the jurisdictional grant of authority provided to the bankruptcy courts by the 1978 Bankruptcy Reform Act. In response, Congress adopted the Bankruptcy Amendments and Federal Judgeship Act ("BAFJA") on July 10, 1984. Prior to the adoption of BAFJA, Congress extended the transition period established by the 1978 Act until June 27, 1984. BAFJA granted the bankruptcy courts jurisdiction over all core bankruptcy matters and established the courts as adjuncts to the district court for all non-core bankruptcy matters. Section 121(e) provided that "[t]he term of office of any bankruptcy judge who was serving on June 27, 1984, is extended to and shall expire at the end of the day of enactment of this Act." P.L. No. 98-353, 98 Stat. 346 (1984). Section 106(a) provided that "the term of office of a bankruptcy judge who is serving on the date of enactment of this Act is extended to and expires four years after the date such bankruptcy judge was last appointed to such office or on October 1, 1986, whichever is later." P.L. No. 98-353, 98 Stat. 342 (1984).
 
 
 22
 The appellant argues that Sec. 106(a) constituted an appointment of bankruptcy judges in violation of Article II.[5] According to the appellant, the terms of the bankruptcy judges serving during the transition period elapsed on June 27, 1984. Thus, when BAFJA was adopted on July 10, 1984, these positions were all vacant. By continuing the judges in office under the authority of Sec. 106(a), appellant argues, BAFJA in essence resulted in a unilateral congressional appointment of these judges that bypassed Article II's requirement of presidential nomination.
 
 
 23
 The appellants' argument has been rejected by every court that has considered it. See e.g., In re Lombard-Wall Inc., 48 B.R. 986, 993 (S.D.N.Y.1985); In re Moody, 46 B.R. 231, 233 (M.D.N.C.1985); In re Tom Carter Enters., Inc., 44 B.R. 605, 606-07 (C.D.Cal.1984); In re Benny, 44 B.R. 581 (N.D.Cal.1984), dismissed in part on other grounds, 791 F.2d 712 (9th Cir.1986); In re Sweetwater, 55 B.R. 724, 726-28 (D.Utah 1985) aff'd on other grounds and rev'd on other grounds, 884 F.2d 1323 (10th Cir.1989); In re Southern Indus., 66 B.R. 349, 357-59 (Bankr.E.D.Tenn.); In the Matter of Baldwin-United Corp., 48 B.R. 49, 53 (Bankr.S.D.Ohio, 1985). The seminal case in this regard is In re Benny. In that case, the court based its conclusion that Sec. 106(a) of BAFJA did not result in an unconstitutional appointment of bankruptcy judges on both Sec. 404(b) of the 1978 Act and Sec. 121(e) of BAFJA.
 
 
 24
 Section 404(b) of the 1978 Act, the Benny court argued, contained a holdover provision which expressly authorized the bankruptcy judges to serve beyond the expiration of the transition period. This holdover provision, according to the court, consisted of the second part of the disjunctive contained in Sec. 404(b) that provided that the bankruptcy judges were to serve until their successors were appointed. In light of this holdover provision, the Benny court concluded, the bankruptcy judges were still lawful office holders at the time BAFJA was adopted, notwithstanding the expiration of the transition period on June 27, 1984. Thus, rather than constituting an unlawful appointment of these judges, Sec. 106(a) merely served to extend the terms of the existing bankruptcy judges, similar to Sec. 404(b) of the 1978 Act. See id. at 586-88.[6]
 
 
 25
 Alternatively, the court in Benny held that Sec. 106(a) of BAFJA did not result in an unconstitutional appointment of judges in light of Sec. 121(e) of the same act. The court concluded that Sec. 121(e) constituted a holdover provision which extended the terms of the bankruptcy judges until the adoption of BAFJA. See 44 B.R. at 588-92. The court dismissed the contention that Sec. 121(e) was invalid because it was adopted after the transition period had expired. Retroactive legislation in and of itself, the court argued, was not antithetical to the strictures of the appointments clause. Rather, the critical inquiry was whether the legislation impermissibly intruded on the inherent authority of the executive branch. The court concluded that Sec. 121(e) did not impermissibly intrude on the president's appointment power and therefore affected a valid retroactive extension of the bankruptcy judge's terms of office. Id. at 592-98; see also In re Tom Carter, 44 B.R. at 608 ("[Section 121(e)'s] retroactive extension of office of bankruptcy judge can in no principled way be said to encroach upon the separation of powers principles embodied in said Appointments Clause").
 
 
 26
 Although plausible arguments can be raised in response to the reasoning adopted by the Benny court, we are ultimately persuaded that this reasoning is correct. Accordingly, for substantially the same reasons advanced in Benny, we reject the appellants' claim in the instant case that the bankruptcy judge was without authority to hear the trustee's suit because he was appointed in violation of Article II.
 
 
 27
 III. The Jurisdiction of the Bankruptcy Court Under the SIPA
 
 
 28
 The appellants' final jurisdictional claim is that the bankruptcy court lacked statutory jurisdiction to try cases brought under the SIPA. The bankruptcy court agreed that it lacked jurisdiction but the district court reversed on appeal. We find that the bankruptcy court possessed statutory jurisdiction over the trustee's suit on the basis of Sec. 78eee(b)(4) of the SIPA.
 
 
 29
 Section 78eee(b)(4) is entitled "Removal to bankruptcy court" and provides that "[u]pon the issuance of a protective decree ... the [district] court shall forthwith order the removal of [a SIPA] liquidation proceeding to the court of the United States in the same judicial district having jurisdiction over cases under Title 11."[7] The appellants argue that this section does not confer jurisdiction on the bankruptcy courts because under 28 U.S.C. Sec. 1334(a), adopted as part of BAFJA in response to Northern Pipeline, it is the district courts and not the bankruptcy courts that currently have jurisdiction over title 11 cases.[8] Thus, the appellants conclude, Sec. 78eee(b)(4)'s statement that the district court is to remove a SIPA proceeding to the court having jurisdiction over title 11 cases cannot be read as authorizing removal of SIPA proceedings to the bankruptcy courts.
 
 
 30
 We reject this reading of Sec. 78eee(b)(4) because it would lead to an absurd result clearly at odds with the intention of Congress. See United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 (10th Cir.1992) ("[U]nless the statutory language is ambiguous or would lead to absurd results, the plain meaning of the statute must control."); Resolution Trust Corp. v. Westgate Partners, Ltd., 937 F.2d 526, 529-30 (10th Cir.1991) (a court is to apply the plain language of a statute unless "a plain language interpretation would lead to an outcome so 'absurd' that Congress clearly could not have intended such an outcome"). The SIPA specifies that it is the district courts that have exclusive jurisdiction over liquidation proceedings commenced by the SIPC. See 15 U.S.C. Sec. 78aa. Thus, to interpret the recipient of the removal action referred to in Sec. 78eee(b)(4) as also being a district court would lead to a twofold absurdity: from a functional standpoint, it would require the district courts to remove SIPA liquidation proceedings to themselves, and from a linguistic standpoint, it would render meaningless Sec. 78eee(b)(4)'s reference to "the court in the same judicial district," because there is only one district court in each district.
 
 
 31
 Generally, in determining how to avoid an absurdity generated by the plain language of a statute, a court is to look to congressional intent. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). In the instant case, we conclude, based on the legislative history of Sec. 78eee(b)(4) and the language of Sec. 78fff(b), that Congress intended Sec. 78eee(b)(4) to authorize the removal of SIPA liquidation proceedings to the bankruptcy courts.
 
 
 32
 The legislative history of Sec. 78eee(b)(4) clearly reveals that Congress intended to confer jurisdiction on the bankruptcy courts to preside over SIPA liquidation proceedings. The precursor to the current version of Sec. 78eee(b)(4) specifically provided that the district court "may, at any stage of the [SIPA] proceeding, refer the proceeding to a referee in bankruptcy to hear and determine any or all matters." Sec. 7(b)(4), Pub.L. No. 95-283, 92 Stat. 257 (1978) (amended 1979). In 1979, this provision was subsequently altered to its current form to conform it to the terminology employed by the 1978 Bankruptcy Reform Act, which expanded the jurisdiction of the bankruptcy courts to all cases arising under title 11. See S.Rep. No. 989, 95th Cong., 2d Sess., at 18 (1978), reprinted in, 1978 U.S.C.C.A.N. 5787, 5804. Accordingly, it is likely that the drafters of the current version of Sec. 78eee(b)(4) intended the bankruptcy courts to preside over SIPA liquidation proceedings, and that this intention has become obscured only because of the mere quirk that Congress neglected to amend Sec. 78eee(b)(4) following the Supreme Court's decision in Northern Pipeline in which it struck down the Bankruptcy Reform Act.[9]
 
 
 33
 Our conclusion that Congress intended the bankruptcy courts to preside over SIPA proceedings is supported by the language of 15 U.S.C. Sec. 78fff(b), which provides that "a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." This provision indicates that Congress intended SIPA liquidation proceedings to be treated, in most important respects, identical to a traditional bankruptcy case under title 11. See In re Government Securities, Corp., 972 F.2d 328, 330-31 (11th Cir.1992). It is of course beyond peradventure that one of the fundamental characteristics of a traditional bankruptcy case under title 11 is that it is conducted by a bankruptcy court. See 28 U.S.C. Sec. 157(a) (conferring jurisdiction on bankruptcy judges to hear "all cases under title 11 and all core proceedings arising under title 11"). It would be truly anomalistic, therefore, for Congress to adopt Sec. 78fff(b) while simultaneously refusing to confer jurisdiction on the bankruptcy courts over SIPA proceedings. Accordingly, we conclude that Congress did intend to confer such jurisdiction on the bankruptcy courts by means of Sec. 78eee(b)(4).[10]
 
 
 34
 IV. The Voidability of the $11,858 and $25,000 Payments
 
 
 35
 Although the bankruptcy court concluded that it did not have jurisdiction, the court nevertheless went on to consider the merits of the trustee's suit. It concluded that the $11,858 payment by IBI to the appellants was invalid as a preferential transfer under 11 U.S.C. Sec. 547, and that the $25,000 payment was invalid as a fraudulent transfer under 11 U.S.C. Sec. 548. On appeal, the appellants claim that the $11,858 payment fell within the "ordinary course of business" and "contemporaneous exchange for value" exceptions to Sec. 547, and that the $25,000 payment did not constitute a fraudulent conveyance because IBI received equivalent value in exchange for this payment. The bankruptcy court dismissed both of these claims, in part, on the grounds that the appellants failed to comply with the disclosure requirements imposed by 11 U.S.C. Sec. 329(a). We affirm.
 
 
 36
 Section 329 is a disclosure provision designed to prevent bankruptcy attorneys from extracting more than their fair share from prospective debtors willing to do whatever is necessary to obtain their counsel of choice and avoid unfavorable bankruptcy proceedings. In re NBI, Inc., 129 B.R. 212, 222 (Bankr.D.Colo.1991). Section 329(a) provides:
 
 
 37
 Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.
 
 
 38
 11 U.S.C. Sec. 329(a). As the foregoing language indicates, the disclosure requirements imposed by Sec. 329 are "mandatory not permissive." In re Bennett, 133 B.R. 374, 378 (Bankr.N.D.Tex.1991). Accordingly, an attorney who fails to comply with the requirements of Sec. 329 forfeits any right to receive compensation for services rendered on behalf of the debtor, id. at 379; In re Chapel Gate Apartments, Ltd., 64 B.R. 569, 575 (Bankr.N.D.Tex.1986), and a court may order an attorney sua sponte to disgorge funds already paid to the attorney, In re Saturley, 131 B.R. 509, 522 (Bankr.D.Me.1991); In re Kendavis Indus. Int'l, Inc., 91 B.R. 742, 759 (Bankr.N.D.Tex.1988); In the Matter of Chambers, 76 B.R. 194, 195 (Bankr.M.D.Fla.1987); In re Chapel Gate, 64 B.R. at 574, 575.
 
 
 39
 In the instant case, the district court found that the appellants violated Sec. 329 by failing to disclose their receipt of both the $11,858 payment and the $25,000 payment. We cannot conclude that this finding was clearly erroneous.[11] Davis testified at trial that he was representing IBI, that he received both of the foregoing payments for such representation, and that the payments were made on the same day that the SIPC filed for liquidation. Furthermore, Davis testified that his initial consultation with IBI, for which he received the $11,858 payment, was in contemplation of a SIPA liquidation proceeding, and that the invoice given by Davis to IBI in exchange for the $25,000 retainer explicitly states that the $25,000 retainer was being given in connection with any "matters ... involv[ing] ... SIPC", Addendum to Appellees' Br. at 23. Accordingly, we believe the record adequately supports the bankruptcy court's conclusion that the appellants violated Sec. 329 by failing to disclose the payments it received from IBI.
 
 
 40
 Once the bankruptcy court determined that the appellants violated Sec. 329, the bankruptcy court had the authority to order the appellants to disgorge the two payments they received from IBI. See In re Saturley, 131 B.R. at 522; In re Kendavis Indus. Int'l, Inc., 91 B.R. at 759; In the Matter of Chambers, 76 B.R. at 195; In re Chapel Gate, 64 B.R. at 575. The appellants do not dispute that the district court could have ordered the return of the payments directly under Sec. 329, but argue that it was error for the court to rely on Sec. 329 in determining whether the payments were invalid under Secs. 547 and 548. We disagree. By violating Sec. 329, the appellants forfeited any right to the fees they received from IBI. In re Bennett, 133 B.R. at 379; In re Chapel Gate, 64 B.R. at 575. Although the bankruptcy court could have ordered the appellants to disgorge the payments it received from IBI directly under Sec. 329, we do not believe the bankruptcy court abused its authority in reaching the same result by using Sec. 329 as a basis for approving the trustee's claims under Secs. 547 and 548.
 
 V. Prejudgment Interest
 
 41
 The appellants final claim is that the bankruptcy court erred in awarding prejudgment interest to the trustee. We review a bankruptcy court's award of prejudgment interest for abuse of discretion. See In re Bellanca Aircraft Corp., 850 F.2d 1275, 1281 (8th Cir.1988).
 
 
 42
 The current bankruptcy code does not specify whether the bankruptcy court may award prejudgment interest to a prevailing trustee. In re Indep. Clearing House Co., 41 B.R. 985, 1014 (Bankr.D.Utah 1984) aff'd and rev'd on other grounds, en banc, 77 B.R. 843 (D.Utah 1987). In the absence of a statutory provision to the contrary, prejudgment interest may generally be awarded if 1) the award of prejudgment interest would serve to compensate the injured party, and 2) the award of prejudgment interest is otherwise equitable. Anixter v. Home-Stake Production Co., 977 F.2d 1549, 1554 (10th Cir.1992); FDIC v. Rocket Oil Co., 865 F.2d 1158, 1160 (10th Cir.1989). In bankruptcy proceedings, the courts have traditionally awarded prejudgment interest to a trustee who successfully avoids a preferential or fraudulent transfer from the time demand is made or an adversary proceeding is instituted unless the amount of the contested payment was undetermined prior to the bankruptcy court's judgment. See In re Bellanca Aircraft Corp., 850 F.2d at 1281; In re Indep. Clearing House Co., 41 B.R. at 1015.
 
 
 43
 In the instant case, the award of prejudgment interest to the trustee would unquestionably serve a compensatory purpose. An award of prejudgment interest would serve to compensate the debtor's estate for appellants' use of those funds that were wrongfully withheld from the debtor's estate during the pendency of the current suit. See In re Chase & Sanborn Corp., 127 B.R. 903, 907-10 (Bankr.S.D.Fla.1991); In re Suburban Motor Freight, Inc., 124 B.R. 984, 1005-06 (Bankr.S.D.Ohio 1990); In re H.P. King Co., 64 B.R. 487, 488-89 (Bankr.E.D.N.C.1986). Additionally, an award of prejudgment interest would appear to be consistent with the balance of equities.
 
 
 44
 Finally, there is no dispute that the amount of the contested payment was clearly determined prior to the bankruptcy courts judgment. The trustee has consistently maintained throughout the course of this action that the full amount of each of the two payments made to the appellants by IBI on July 10 were voidable under Secs. 547 and 548. Accordingly, we conclude that the district court did not abuse its discretion in awarding the trustee prejudgment interest.
 
 
 45
 AFFIRMED.
 
 
 
 [1]
 11 U.S.C. Sec. 547 provides in relevant part:
 (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made--
 (A) on or within 90 days before the date of the filing of the petition;
 (5) that enables such creditor to receive more than such creditor would receive if--
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 
 
 [2]
 11 U.S.C. Sec. 548 provides in relevant part:
 (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
 (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
 (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
 (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
 (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
 (iii) intended to incur, or believed that the debtor would incur, debts that would go beyond the debtor's ability to pay as such debts matured.
 
 
 [3]
 Bankruptcy courts are non-Article III tribunals. See Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 50, 109 S.Ct. 2782, 2794, 106 L.Ed.2d 26 (1989)
 
 
 [4]
 Section 404(b) provides in relevant part:
 The term of a referee in bankruptcy who is serving on the date of enactment of this Act is extended to and expires on March 31, 1984 or when his successor takes office.
 
 
 [5]
 The appointments clause states that the president "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const. Art. II, Sec. 2, cl. 2
 
 
 [6]
 The appellants do not dispute that Congress may, consistent with Article II, unilaterally extend the terms of United States officers who have previously been appointed to their posts in accordance with Article II. See In re Tom Carter, 44 B.R. at 607 ("[T]he Supreme Court has consistently rejected Appointments Clause attacks on legislation changing the terms and duties of office.")
 
 
 [7]
 Section 78eee(b)(4) provides in full:
 Upon the issuance of a protective decree and appointment of a trustee, or a trustee and counsel, under this section, the court shall forthwith order the removal of the entire liquidation proceeding to the court of the United States in the same judicial district having jurisdiction over cases under Title 11. The latter court shall thereupon have all of the jurisdiction, powers, and duties conferred by this chapter upon the court to which application for the issuance of the protective decree was made.
 
 
 [8]
 28 U.S.C. Sec. 1334(a) provides that "the district court shall have original and exclusive jurisdiction of all cases under title 11."
 
 
 [9]
 That Congress' failure to amend Sec. 78eee(b)(4) is indeed the product of mere oversight rather than deliberate inaction is evidenced by the very title to Sec. 78eee(b)(4), which, as noted above, still reads "Removal to bankruptcy court."
 
 
 [10]
 The appellants suggest in one statement of their brief that if the bankruptcy court has statutory jurisdiction over SIPA proceedings, this jurisdiction is unconstitutional under Article III. However, since the only proceedings at issue in the instant case are proceedings to avoid a preference and a fraudulent transfer, these are the only proceedings we need to consider. See Northern Pipeline, 458 U.S. at 90, 102 S.Ct. at 2881 ("[p]articularly in the area of constitutional law such as that of Art. III Courts, ... the Court should decide no more of a constitutional question than is absolutely necessary") (Rehnquist, J., concurring). As we concluded above, the bankruptcy court's authority to hear actions involving preferences and fraudulent transfers does not contravene the strictures of Article III
 
 
 [11]
 The appellants do not dispute that Sec. 329 is applicable to SIPA liquidation proceedings by virtue of 15 U.S.C. Sec. 78fff(b), which, as noted above, states that such proceedings are to be conducted "in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11."